# UNITED STATES v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 317. Argued March 10, 11, 1891. — Decided October 19, 1891.

Congress, March 3, 1863, granted to Kansas every alternate section of land, designated by *odd* numbers for ten sections in width on each side, in aid of the construction of the following roads and each branch thereof: *First*, a railroad and telegraph from the city of Leavenworth, Kansas, by the way of Lawrence and the Ohio City crossing of the Osage River, to the Southern line of the State in the direction of Galveston Bay, in Texas, with a branch from Lawrence by the valley of the Wakarusa River to the point on the Atchison, Topeka and Santa Fé Railroad, where that road intersects the Neosho River; *Second*, a railroad from the city of Atchison, Kansas, via Topeka, to the western line of that State, in the direction of Fort Union and Santa Fé, New Mexico, with a branch where the latter road crosses the Neosho, down said Neosho Valley to the point where the road, first named, enters the Neosho Valley. The act provided that in the case of deficiencies in place limits, it should "be the duty of the Secretary of the Interior to cause to be selected, for the purposes aforesaid, from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections, or parts of sections, designated by *odd* numbers, as shall be equal to such lands as the United States have sold, reserved or otherwise appropriated, or to which the rights of preëmption or homestead settlements have attached." The act also provided that the "sections and parts of sections of land which, by such grant, shall remain to the United States, within ten miles on each side of said road and branches" [that is, the *even*-numbered sections within the place or granted limits,] "shall not be sold for less than double the minimum price of the public lands when sold; nor shall any of said lands become subject to sale at private entry until the same shall have been first offered at public sale to the highest bidder, at or above the increased minimum price, as aforesaid: *Provided*, That actual and *bona fide* settlers, under the provisions of the preëmption and homestead laws of the United States, may, after due proof of settlement, improvement, cultivation and occupation, as now provided by law, purchase the same at the increased minimum price aforesaid: *And provided, also*, That settlers on any of said reserved sections, under the provisions of the homestead law, who improve, occupy and cultivate the same for a period of five years, and comply with the several conditions and requirements of said act, shall be entitled to patents for an amount

not exceeding eighty acres each, anything in this act to the contrary notwithstanding." By a subsequent act, July 16, 1866, for the benefit of the Union Pacific Railroad Company, Southern Branch, there was granted to the State for the use of that company, " every alternate section of land, or parts thereof, designated by odd numbers to the extent of five alternate sections per mile on each side of said road, and not exceeding in all ten sections per mile; but in case it shall appear that the United States have, when the line of said road is definitely located, sold any section or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid, from the public lands of the United States nearest to the sections above specified, so much land as shall be equal to the amount of such lands as the United States have sold, reserved or otherwise appropriated, or to which the right of homestead settlement or preëmption has attached as aforesaid, which lands, thus indicated by the direction of the Secretary of the Interior, shall be reserved and held for the State of Kansas for the use of said company by the said Secretary for the purpose of the construction and operation of said railroad, as provided by this act." This last act provided also " That any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be, and the same are hereby, reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way, two hundred feet in width, is hereby granted subject to the approval of the President of the United States: *And provided further*, That said lands hereby granted shall not be selected beyond twenty miles from the line of said road." The routes of the Leavenworth, Lawrence and Fort Gibson Railroad Company, which got the benefit of the first road named in the act of 1863, and the Union Pacific Railroad Company, Southern Branch, now the Missouri, Kansas and Texas Railroad Company, which succeeded also to the rights of the Atchison company in respect to the road down the Neosho Valley, crossed each other in the valley, so that some of the *even*-numbered sections within the original place limits of the first-named road were within the indemnity limits of the latter road, and some *even*-numbered sections were within the common indemnity limits of both roads: *Held*, (1) That the *even*-numbered sections within the place limits of the Leavenworth, Lawrence and Fort Gibson Railroad were reserved to the United States by the act of 1863, and, therefore were excepted from the grant in the act of 1866 and could not be patented to the Missouri, Kansas and Texas Railway Company to supply deficiencies in its place limits; (2) The *even*-numbered sections that were within the common indemnity limits of both roads could be used to supply deficiencies in the place limits of the Missouri, Kansas and Texas

Railway Company, saving the rights acquired under the preëmption and homestead laws before the selection of such lands for purposes of indemnity.

The principle reaffirmed that title to indemnity lands does not vest in a railroad company, for the benefit of which they are contingently granted, but remains in the United States until they are actually selected and set apart under the direction of the Secretary of the Interior specifically for indemnity purposes.

Where a patent has been fraudulently obtained, and such fraudulent patent, if allowed to stand, would work prejudice to the interests or rights of the United States, or would prevent the government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the government to institute judicial proceedings to vacate such patent. These principles equally apply where patents have been issued by mistake, and they are especially applicable where a multiplicity of suits, each one depending upon the same facts and the same questions of law, can be avoided, and where a comprehensive decree, covering all contested rights, would accomplish the substantial ends of justice.

*Kansas City, Lawrence &c. Railroad* v. *The Attorney General*, 118 U. S. 682 distinguished, and held to decide only the right of the Missouri, Kansas and Texas Company to indemnity from the *odd*-numbered sections within the overlapping indemnity limits of that company and the Leavenworth, Lawrence and Fort Gibson Company.

IN EQUITY. Defendants demurred to the bill, and the demurrer was sustained and the bill dismissed. Plaintiffs appealed. The case is stated in the opinion.

*Mr. Assistant Attorney General Maury* for appellants.

*Mr. A. B. Browne, Mr. A. L. Williams* and *Mr. Simon Sterne*, (with whom on the brief were *Mr. A. T. Britton* and *Mr. James Hagerman*,) for the Missouri, Kansas and Texas Railway Company, appellee.

*Mr. William Lawrence*, on behalf of settlers, for appellants.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a suit in equity by the United States for the cancellation of certain patents for lands in Allen County, Kansas, of date respectively November 3, 1873, March 19, 1875, August

17, 1876, and April 23, 1877; and alleged to have been issued to the Missouri, Kansas and Texas Railway Company without authority of law.

The institution of such a suit as this was recommended by the Secretary of the Interior in a communication addressed to the Attorney General under date of June 10, 1886. 4 Land Decisions, 573, 578 ; 5 Land Decisions, 280, 481. The present suit was not, however, brought until after the passage of the act of Congress of March 3, 1887, requiring the immediate adjustment by the Secretary of the Interior, in accordance with the decisions of this court, of all unadjusted land grants made by Congress to aid in the construction of railroads. 24 Stat. 556, c. 376. That act made it the duty of the Attorney General to commence and prosecute suits for the cancellation of all patents, certification or other evidence of title issued for public lands, and to restore the title to the United States in all cases of lands appearing — upon the completion of such adjustments or sooner — to have been " erroneously certified or patented, by the United States, to or for the use or benefit of any company claiming by, through or under grant from the United States, to aid in the construction of a railroad," if such company neglected or failed, upon demand by the Secretary of the Interior, to relinquish or reconvey to the United States all such lands, whether within granted or indemnity limits. (Sections 1 and 2.)

The act also provided that a *bona fide* settler whose homestead or preëmption entry had been erroneously cancelled on account of any railroad grant, or the withdrawal of public lands from market, should, upon application, be reinstated in all his rights and allowed to perfect his entry, by complying with the public land laws, provided he had not located another entry in lieu of the one so erroneously cancelled, or voluntarily abandoned his original entry ; and if a settler did not, within a reasonable time to be fixed by the Secretary of the Interior, make his application to be reinstated, all such unclaimed lands were required to be disposed of under the public land laws, with priority of right to *bona fide* purchasers, if any; then to *bona fide* settlers residing thereon.   (Section 3.)

In respect to lands, except those last mentioned, found to have been erroneously certified or patented, and to have been sold by the grantee company to citizens of the United States, or to persons who had declared their intention to become such, it was provided that "the person or persons so purchasing in good faith, his heirs or assigns, shall be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as may be prescribed by the Secretary of the Interior, after the grants respectively shall have been adjusted; and patents of the United States shall issue therefor, and shall relate back to the date of the original certification or patenting, and the Secretary of the Interior, on behalf of the United States, shall demand payment from the company which has so disposed of such lands of an amount equal to the Government price of similar lands;" the right of the purchaser of the lands so erroneously withdrawn, certified or patented to recover the purchase-money therefor from the grantee company, less the amount paid to the United States by such company, being saved; and no mortgage or pledge of the lands by the company to be considered as a sale for the purpose of the act. (Section 4.)

It was further provided that where a company had sold to citizens of the United States, or to persons who had declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for its use, such lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of the road, and where the lands so sold were excepted from the operation of the grant to the company, it should be lawful for the *bona fide* purchaser thereof from the company to make payment to the United States at the ordinary Government price for like lands, and thereupon patents should issue therefor to him, his heirs or assigns. All lands were excepted from these provisions which at the date of such sales were in the *bona fide* occupation of adverse claimants under the preëmption or homestead laws of the United States, and whose claims and occupation had not since been voluntarily abandoned; as to which excepted lands

the said preëmption and homestead claimants were permitted to perfect their proofs and entries and receive patents.    These last provisions do not apply "to lands settled upon subsequent to the first day of December, eighteen hundred and eighty-two, by persons claiming to enter the same under the settlement laws of the United States, as to which lands the parties claiming the same as aforesaid shall be entitled to prove up and enter as in other like cases."    (Section 5.)

Demurrers to the bill having been sustained, 37 Fed. Rep. 68, and the suit dismissed, the United States prosecuted the present appeal.

The lands in dispute are of two classes: 1. *Even*-numbered sections that are within the original ten-mile or place limits of the Leavenworth, Lawrence and Fort Gibson Railroad Company, subsequently named the Leavenworth, Lawrence and Galveston Railroad Company, and to be hereafter, in this opinion, referred to as the Leavenworth Company.    Those sections are also within the indemnity limits of the Missouri, Kansas and Texas Railroad Company, originally named the Union Pacific Railroad Company, Southern Branch, and to be hereafter referred to as the Missouri-Kansas Company. 2. *Even*-numbered sections within the common indemnity limits of both roads.

No question is presented in this case as to the *odd*-numbered sections within either the place or the indemnity limits of the Leavenworth road.

In respect to each of the above classes of lands, the bill alleges that rights had attached under the homestead and preëmption laws in favor of settlers; some, before the passage of the act, to be presently referred to, under which the Missouri-Kansas Company claims, and others after that date, but before the selection of such lands, by the direction of the Secretary of the Interior, as indemnity lands for that company.

But the principal question raised by the demurrer is whether the Missouri-Kansas Company was entitled, under any circumstances whatever, to make up losses or deficiencies, occurring in *its* place limits, from *even*-numbered sections within either the place or indemnity limits of the Leavenworth road.    This

question depends upon the construction of three acts of Congress, passed, respectively, March 3, 1863, July 1, 1864, and July 26, 1866, granting lands to the State of Kansas to aid in the construction of these railroads.

The grant made by the act of March 3, 1863, was of every alternate section of land, designated by *odd* numbers for ten sections in width on each side, in aid of the construction of the following roads and each branch thereof: *First*, a railroad and telegraph from the city of Leavenworth, Kansas, by the way of Lawrence and the Ohio City crossing of the Osage River, to the southern line of the State in the direction of Galveston Bay, in Texas, with a branch from Lawrence by the valley of the Wakarusa River to the point on the Atchison, Topeka and Santa Fé Railroad, where that road intersects the Neosho River; *Second*, a railroad from the city of Atchison, Kansas, via Topeka, to the western line of that State, in the direction of Fort Union and Santa Fé, New Mexico, with a branch where the latter road crosses the Neosho, down said Neosho Valley to the point where the road, first named, (the Leavenworth road,) enters the Neosho Valley. In respect to each road and branches, it was provided that "in case it shall appear that the United States have, when the lines or routes of said road and branches are definitely fixed, sold any section or any part thereof granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States, for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid from the public lands of the United States nearest to tiers of sections above specified, so much land, in alternate sections, or parts of sections, designated by *odd* numbers, as shall be equal to such lands as the United States have sold, reserved or otherwise appropriated, or to which the rights of preëmption or homestead settlements, have attached as aforesaid; which lands thus indicated by *odd* numbers, and selected by direction of the Secretary of the Interior as aforesaid, shall be held by the State of Kansas for the use and purpose aforesaid: *Provided*, That the land to be so selected shall, in no

case, be located further than twenty miles from the lines of said road and branches: *Provided, further,* That the lands hereby granted for and on account of said roads and branches severally, shall be exclusively applied in the construction of the same, and for no other purpose whatever, and shall be disposed of only as the work progresses through the same, as in this act hereinafter provided. . . ." 12 Stat. 772, c. 98, § 1.

The second section of the act provided that "the sections and parts of sections of land which, *by such grant,* shall *remain to the United States,* within *ten* miles on each side of said road and branches," [that is, the *even*-numbered sections within the place or granted limits,] "shall not be sold *for less than double the minimum price of the public lands when sold; nor shall any of said lands become subject to sale at private entry until the same shall have been first offered at public sale to the highest bidder,* at or above the *increased minimum price,* as *aforesaid: Provided,* That actual and *bona fide* settlers, under the provisions of the preëmption and homestead laws of the United States, may, after due proof of settlement, improvement, cultivation and occupation, as now provided by law, purchase the same *at the increased minimum price, aforesaid: And provided, also,* that settlers on any of said *reserved sections,* under the provisions of the homestead law, who improve, occupy and cultivate the same for a period of five years, and comply with the several conditions and requirements of said act, shall be entitled to patents for an amount not exceeding eighty acres each, anything in this act to the contrary notwithstanding."

The State of Kansas, by an act approved February 9, 1864, accepted the above grant, upon the terms and conditions prescribed by Congress; and gave the benefit of it, in respect to the railroad and telegraph first mentioned in the act of 1863, to the Leavenworth Company; and in respect to the other railroad and telegraph, to the Atchison, Topeka and Santa Fé Railroad Company, formerly the Atchison and Topeka Railroad Company, to be hereafter referred to as the Atchison Company.

By the act of July 1, 1864, Congress granted to Kansas, to

aid in the construction of a railroad and telegraph line from Emporia by the way of Council Grove, to a point near Fort Riley, on the branch Union Pacific Railroad, in that State, " every alternate section of land designated by odd numbers for ten sections in width on each side of said road," subject to the provisions, restrictions, limitations and conditions prescribed in the above act of March 3, 1863; and also changed the branch railroad and telegraph line from Lawrence by the valley of the Wakarusa River to a point on the Atchison, Topeka and Santa Fé Railroad, where that road intersects the Neosho River, so as to run from Lawrence to Emporia, and thus changed, to have the grant of lands made by the act of 1863. 13 Stat. 339, c. 198.

The above acts of Congress of 1863 and 1864 were accepted; and thereafter, by writing, of date March 19, 1866, the Atchison Company sold, assigned and transferred to the Union Pacific Railroad Company, Southern Branch, a corporation of Kansas — the Missouri-Kansas Company — all the rights, titles, interests, franchises, privileges, immunities and liabilities held, acquired, possessed and enjoyed for constructing, maintaining, operating and enjoying a railroad, from a point at or near Fort Riley down the Neosho Valley to where the Leavenworth road might enter the Neosho Valley; "which rights, titles, interests, franchises, authorities, immunities and liabilities accrued to and became vested" in the assignor company " by virtue of its acceptance of the provisions of the act of the legislature of the State of Kansas;" the assignee company agreeing to perform all the duties, and to meet all the obligations and liabilities, assumed by the other company in respect to the said road. This assignment was ratified by a joint resolution of the legislature of Kansas passed February 27, 1867.

The act of July 26, 1866, provided, among other things, that for the purpose of aiding the Union Pacific Railroad Company, Southern Branch, [the Missouri-Kansas Company,] a corporation organized under the laws of the State of Kansas, "to construct and operate a railroad from Fort Riley, Kansas, or near said military reservation, thence down the valley of

the Neosho River to the southern line of the State of Kansas, with a view to an extension of the same through a portion of the Indian Territory to Fort Smith, Arkansas, there is hereby granted to the State of Kansas, for the use and benefit of said railroad company, every alternate section of land or parts thereof designated by *odd* numbers to the extent of five alternate sections per mile on each side of said road, and not exceeding in all ten sections per mile : but in case it shall appear that the United States have, when the line of said road is definitely located, sold any section or any part thereof, granted as aforesaid, or that the right of preëmption or homestead settlement has attached to the same, or that the same has been reserved by the United States for any purpose whatever, then it shall be the duty of the Secretary of the Interior to cause to be selected for the purposes aforesaid, *from the public lands of the United States nearest to the sections above specified,* so much land as shall be equal to the amount of such lands as the United States have sold, reserved or otherwise appropriated, or to which the right of homestead settlement or preëmption has attached as aforesaid, which lands, thus indicated by the direction of the Secretary of the Interior, shall be reserved and held for the State of Kansas for the use of said company by the said Secretary for the purpose of the construction and operation of said railroad, as provided by this act : *Provided,* That *any* and *all* lands *heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose* of *aiding in any object of internal improvement or other purpose whatever,* be, and the same are hereby, *reserved and excepted from the operation of this act,* except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right of way, two hundred feet in width, is hereby granted subject to the approval of the President of the United States : *And provided further,* That said lands hereby granted shall not be selected beyond twenty miles from the line of said road." 14 Stat. 289, c. 270.

The contention of the government is, that the lands in dispute — the *even*-numbered sections within both the place limits

and the indemnity limits of the Leavenworth road — had been
"reserved to the United States" by the act of 1863, and,
therefore, were excluded from the operation of the act of 1866;
consequently they could not be taken for or patented to the
Missouri-Kansas Company. If the premise of this contention
be true the conclusion just stated would necessarily follow;
because, although by the first section of the act of 1866 that
company was entitled to indemnity from "the public lands of
the United States nearest to the sections" within its granted
or place limits, and within twenty miles of its line, for all
granted sections or parts of granted sections, which, at the
time of the definite location of its road appeared to have been
sold by the United States, or to which the right of preëmption
or homestead settlement had attached, or which had been
reserved to the United States for any purpose whatever, the
first proviso of the same section reserved and excepted *from
the operation of the act* all lands *reserved to the United States*
by any act of Congress, or in any other manner by competent
authority, for the purpose of aiding in any object of internal
improvement, or other purpose whatever. Of course, lands so
reserved and excepted from the operation of the act could not
be selected as indemnity lands for the road in aid of the
construction of which the grant of 1866 was made. The
important inquiry, therefore, is, whether, within the meaning
of the act of 1866, the lands in dispute, or any of them, were
reserved to the United States by the act of 1863.

A reservation clause, such as the one in the act of 1866, first
appeared in the act of Congress of September 20, 1850, grant-
ing lands to the State of Illinois in aid of the construction of
what is now the Illinois Central Railroad. 4 Land Decisions,
575. Congress, by an act passed March 2, 1827, had made a
similar grant in aid of the construction of the Illinois and
Michigan Canal, with a reservation of each alternate section
to the United States. In order that the canal might have the
full benefit of the lands covered by the grant of 1827, the fol-
lowing clause was inserted in the act of 1850 : "*And provided
further*, That any and all lands reserved to the United States
by the act entitled 'An act to grant a quantity of land to the

State of Illinois for the purpose of aiding in opening a canal to connect the waters of the Illinois River with those of Lake Michigan,' approved March 2, 1827, be, and the same are hereby, reserved to the United States from the operations of this act." 9 Stat. 466, c. 61; Cong. Globe, vol. 21, p. 900. The policy indicated by this reservation was pursued in all subsequent acts granting lands to aid in the construction of railroads; the only difference between the reservation clause in the act of 1850, and those inserted in subsequent acts, being that the former was special in its application to a particular previous grant, while each one of the latter class was general in its application to prior grants of every kind. The manifest object of the general proviso was to exclude from the particular grant all lands previously reserved to the United States for any specific object whatever, and, thereby, enable the Government to accomplish those objects without confusion or conflict in the administration of the public domain, and thus keep faith with those to or for whose benefit prior grants were made. *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66; *Wolcott* v. *Des Moines Co.*, 5 Wall. 681, 687; *Homestead Co.* v. *Valley Railroad Co.*, 17 Wall. 153; *Wolsey* v. *Chapman*, 101 U. S. 755; *Litchfield* v. *Webster County*, 101 U. S. 773; *Dubuque &c. Railroad* v. *Des Moines Valley Railroad Co.*, 109 U. S. 329; *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629; *Bullard* v. *Des Moines &c. Railroad*, 122 U. S. 167, 176; *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357.

Having regard to the words and the conceded object of the reservation clause, we are of opinion that the position of the Government, in respect to the *even*-numbered sections, within the *ten-mile* or *place* limits of the Leavenworth road, is well taken. The grant, in the act of 1863, was of every alternate section of land designated by *odd* numbers, for ten sections in width on each side of the road, with the right, in case of loss of lands, within the place limits, from any of the specified causes, to select indemnity lands (not, generally, from the public lands of the United States, but) from "the public lands of the United States nearest *to tiers* of sections above specified," that is, nearest to the tiers of sections in place limits, and

within twenty miles of the road — the lands, thus selected for indemnity, to be *odd*-numbered sections. It is too obvious to require argument to show that, as losses to the Leavenworth road in its place limits were required to be made up from *odd*-numbered sections inside of the exterior line of its indemnity limits, the *even*-numbered sections in its place limits could not be used to supply such deficiencies. Such *even*-numbered sections in the place limits were, therefore, referred to in the second section of the act of 1863, as "reserved sections" that "remain to the United States."

The defendants insist, however, that they were not "reserved to the United States" within the meaning of the act of 1866. It is true, they were not reserved to aid in the construction of the Leavenworth road, or for any specified object of internal improvement. But the act of 1866 does not restrict the objects of the reservation to works of internal improvement. If the reservation in question was by Congress, or other competent authority, *for any purpose whatever*, then the lands so reserved were excluded from the operation of the act of 1866. Now, it is clear that the *even*-numbered sections, within the place limits of the Leavenworth road, were reserved by the act of 1863, for purposes distinctly declared by Congress, and which might be wholly defeated if the Missouri-Kansas Company were permitted to take them as indemnity lands under the act of 1866. The requirement in the second section of the act of 1863, that the "reserved sections" which "remain to the United States," within ten miles on each side of the Leavenworth road, "shall not be sold for less than double the minimum price of the public lands when sold," nor be subject to sale at private entry until they had been offered at public sale to the highest bidder, at or above the increased minimum price; the privilege given to actual *bona fide* settlers, under the preëmption and homestead laws, to purchase *those lands* at the increased minimum price, after due proof of settlement, improvement, cultivation and occupancy; and the right accorded to settlers on such sections under the homestead laws, improving, occupying and cultivating the same, to have patents for not exceeding eighty acres each, are inconsistent

with the theory that the *even*-numbered sections, so remaining to the United States, within the place limits of the Leavenworth road could be taken as *indemnity* lands for a railroad corporation.

As the natural result of the construction of the road aided would be an increase in the market value of the reserved sections remaining to the United States, within the place limits of the Leavenworth road, those sections were not left to be disposed of under the general laws relating to the public domain. But, in order that the government might get the benefit of such increased value, and thereby reimburse itself to some extent for the lands granted — the title to which vested in the State or the company upon the definite location of the line of the road, and, by relation, as of the date of the grant, — the act of 1863 made special provisions in reference to those reserved sections, and thereby, and for the accomplishment of particular purposes expressly declared, segregated them from the body of the public lands of the United States. Being thus devoted to specified objects, they were reserved to the United States, and could not be selected by the State either under the act of 1863 or under that of 1866 for other and different objects. They could not be selected as indemnity lands under the act of 1863, because the lands to be selected under that act were restricted to *odd*-numbered sections; nor under the act of 1866, because, at the date of its passage they were reserved for the special purposes indicated in the second section of the act of 1863.

It follows that the Missouri, Kansas and Texas Railroad Company was not entitled, in virtue of the act of 1866, to have indemnity lands from the *even*-numbered sections within the *place* limits of the Leavenworth road. The issuing of patents to it for such lands was unauthorized by law.

But we are of opinion that, in respect to the *even*-numbered sections within the *indemnity* limits of the Leavenworth road, that is, outside of ten and within twenty miles of its line, the case stands upon wholly different grounds. We cannot assent to the suggestion that they also were reserved by the act of 1863, and excluded from the operation of the act of 1866.

The utmost that could be claimed, in respect to lands within the indemnity limits of the Leavenworth road, is, that the *odd*-numbered sections in those limits being designated by the act of 1863 as the source from which to supply losses in the place limits of that road, were excluded from the operation of the act of 1866. Whether such a claim could be sustained or not, we need not now inquire; but that contention, if sound, does not meet the exigencies of the present .case. We are dealing here with the *even*-numbered sections in the indemnity limits of the Leavenworth road, which were not devoted by the act of 1863 to any specified purpose, but were left under the general laws regulating the disposal of the public lands. No provision was made, as in the case of the even-numbered or reserved sections within the place limits, for their sale at not less than double the minimum price of the public lands when sold, nor were any restrictions placed upon their sale or disposition different from those applicable to the public lands generally. Settlers under the preëmption and homestead laws were accorded by the act of 1863 no more rights and privileges in respect to the *even*-numbered sections within the *indemnity* limits of the Leavenworth road than they had in other public lands of the United States wherever situated. They were reserved to the United States only in the sense that all the public lands of the United States, not set apart for some declared object, are reserved to be disposed of under the general laws relating to the public domain. But a reservation of that general character is not what was meant by the act of 1866. That act excluded from its operation only such lands as had been reserved by Congress or other competent authority for some distinct, defined purpose.

. This conclusion finds support in the peculiar language of the act of 1866 allowing selections by the Missouri-Kansas Company of indemnity lands within twenty miles of its road, to be made from "the public lands of the United States nearest to the sections above specified," that .is, nearest to the *odd*-numbered sections within the place limits. Many acts of Congress, making grants of public lands in aid of the construction of railroads, have restricted the selection of indem-

nity lands simply to alternate sections or parts of sections nearest or most contiguous to the tier of sections in the place limits; thus apparently leaving it to the Secretary of the Interior — subject, it may be, to the requirement as to alternation — to approve as he might think best, the selection of odd-numbered or even-numbered sections within the prescribed indemnity limits.[1] In many other acts the selection of indemnity lands was restricted to the *odd*-numbered sections, as was the case in the above act of 1863.[2] The two classes of acts are to be found in the legislation of Congress, at the session when the act of July 26, 1866, for the benefit of the Missouri-Kansas Company, was passed. The grants to Missouri and Minnesota of July 4, 1866; to Kansas of July 23, 1866; to the California and Oregon Railroad Company of July 25, 1866; and to the Atlantic and Pacific Railroad Company of July 27, 1866, all, in terms, provided for the selection of *odd*-numbered sections for purposes of indemnity; while the grant to Kansas of July 25, 1866, to aid in the construction of the Kansas and Neosho Valley Railroad Company, and the grant of July 26, 1866, to the same State, for the benefit of the Missouri-Kansas Company, contained no such restriction, and only required that indemnity lands be selected from the public lands of the United States nearest to the tier of granted sections within the place limits of the respective roads. 14 Stat. 83, c. 165; Id. 87, c. 168; Id. 210, c. 212; Id. 239, c. 242; Id. 293, 295, c. 278; Id. 236, c. 241; Id. 289, c. 270. This difference in land grant acts was not unusual, as will be seen from the vari-

---

[1] Illinois (1850), 9 Stat. 466; Missouri (1852), 10 Stat. 8; Arkansas and Missouri (1853), 10 Stat. 155; Iowa (1856), 11 Stat. 9; Florida (1856), 11 Stat. 15; Alabama (1856), 11 Stat. 17; Louisiana (1856), 11 Stat. 18; Michigan (1856), 11 Stat. 21; Wisconsin (1856), 11 Stat. 20; Mississippi (1856), 11 Stat. 30; Minnesota and Alabama (1857), 11 Stat. 195; Minnesota (1864), 13 Stat. 64; Wisconsin (1864), 13 Stat. 66.

[2] Kansas (1863), 12 Stat. 772; Iowa (1864), 13 Stat. 72; Northern Pacific Railroad (1864), 13 Stat. 365; Minnesota (1866), 14 Stat. 87; Kansas (1866), 14 Stat. 210; California and Oregon Railroad (1866), 14 Stat. 239; Atlantᵢ and Pacific, and Southern Pacific Railroads (1866), 14 Stat. 292; Oregon Central Railroad (1870), 16 Stat. 94; Texas Pacific Railroad (1871), 16 Stat. 573.

ous statutes cited in the margin. We do not feel at liberty to hold that this difference was unintentional upon the part of Congress. It is too well defined in its legislation to justify any such interpretation. The words in the act of July 26, 1866, for the benefit of the Missouri-Kansas Company, indicating the source from which indemnity lands were to be obtained, namely, " from the public lands of the United States nearest to sections above specified," cannot well be held to mean the same thing as the words, in other acts, " from the public lands of the United States nearest to tiers of sections above specified, so much land in alternate sections or parts of sections *designated by odd numbers*." In one case the selection, for purposes of indemnity, may be from any of the public lands of the United States nearest to the tier of sections in the place limits; in the other, the selection is restricted to odd-numbered sections within the indemnity limits; in neither case, however, could lands be selected that had been previously withdrawn by competent authority from location, sale or entry, or had been appropriated or sold by the United States, or to which preëmption or homestead rights had attached.

In our judgment — omitting for the present any consideration of the rights alleged to have been acquired by individuals under the homestead and preëmption laws in the lands in dispute, and looking at the case only as between the United States and the Missouri-Kansas Company — there is no escape from the conclusion that the *even*-numbered sections within the indemnity limits of the Leavenworth road, not being set apart by the act of 1863 for any specific purpose, and being also nearest to the granted sections within the place limits of the Missouri-Kansas Company, were not, by that act, reserved to the United States within the meaning of the act of 1866, and, therefore, — if no rights had attached to them before their selection with the approval of the Secretary of the Interior — could have been legally selected as indemnity lands for that company.

We say, prior to such selection and approval, because as to lands which may legally be taken for purposes of indem-

nity the principle is firmly established that title to them does not vest in the railroad company, for the benefit of which they are contingently granted, but, in the fullest legal sense, remains in the United States, until they are actually selected and set apart, under the direction of the Secretary of the Interior, specifically for indemnity purposes. It was so held in *Kansas Pacific Railroad* v. *Atchison Railroad*, 112 U. S. 414, 421, in which the court, referring to the above act of 1863, said in reference to the lands in the indemnity limits: " Until selection was made the title remained in the government, subject to its disposal at its pleasure. . . . The grant to Kansas, as stated, conferred only a right to select lands beyond ten miles from the defendant's road, upon certain contingencies. It gave no title to indemnity lands in advance of their selection." The same principle was announced in *Barney* v. *Winona & St. Peter Railroad*, 117 U. S. 228, 232, where the court said: " In the construction of land grant acts in aid of railroads, there is a well-established distinction observed between 'granted lands' and 'indemnity lands.' The former are those falling within the limits specially designated, and the title to which attaches when the lands are located by an approved and accepted survey of the line of the road filed in the Land Department, as of the date of the act of Congress. The latter are those lands selected in lieu of parcels lost by previous disposition or reservation for other purposes, and the title to which accrues only from the time of their selection." So in *Sioux City &c. Railroad* v. *Chicago, Milwaukee &c. Railway*, 117 U. S. 406, 408 : " No title to indemnity lands was vested until a selection was made by which they were pointed out and ascertained, and the selection made approved by the Secretary of the Interior." But the fullest and most recent expression of opinion upon this question by this court is in *Wisconsin Central Railroad* v. *Price County*, 133 U. S. 496, 511, where it was said : " He [the Secretary] was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands ; and, in the second place, whether the particular indemnity lands selected could be properly taken for

those deficiencies. In order to reach a proper conclusion on these two questions, he had also to inquire and determine whether any lands in the place limits had been previously disposed of by the Government, or whether any preëmption or homestead rights had attached before the line of the road was definitely fixed. There could be no indemnity unless a loss was established. . . . Until the selections were approved there were no selections in fact, only preliminary proceedings taken for that purpose; and the indemnity lands remained unaffected in their title. Until then the lands which might be taken as indemnity were incapable of identification; the proposed selections remained the property of the United States. The Government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced in the courts." To the same effect were the previous cases of *Grinnell* v. *Railroad Co.*, 103 U. S. 739 ; *St. Paul &c. Railroad* v. *Winona & St. Peter Railroad*, 112 U. S. 720, 731; *Cedar Rapids & Missouri River Railroad* v. *Herring*, 110 U. S. 27. As to the exception to this rule noticed in *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad*, 139 U. S. 1, 19, it is sufficient to say that it has no application to the facts of this case. In respect, therefore, of even-numbered sections within the indemnity limits of the Leavenworth road, preëmption and homestead rights may have legally attached before their final selection as indemnity lands for the Missouri-Kansas Company. And rights thus attaching would not be displaced by subsequent selection, and by issuing patents to the railroad company.

For the reasons stated, we adjudge that the selection of *even-*numbered sections within the indemnity limits of the Leavenworth road, to which rights of homestead and preëmption laws had not attached, to indemnify the Missouri-Kansas Company for losses in its place limits, and the issuing to it of patents therefor, was not without authority of law.

We have indicated, however, that the question as to the right of the Missouri-Kansas Company, for purposes of indem-

nity, to select *even*-numbered sections within the indemnity limits of the Leavenworth road, may, according to the averments of the bill — which the demurrer admits to be true — have some connection with the rights acquired by individuals under the homestead and preëmption laws. These averments are : That prior to July 26, 1866, and prior to the selection of indemnity lands for the Missouri-Kansas Company, by the Secretary of the Interior — which selections, it is alleged, were partially made on each of the respective days of August 20, 1872, July 29, 1874 and May 10, July 12 and December 26, 1876 — a large number of actual and *bona fide* settlers over the age of twenty-one years, and citizens of the United States, each thus and otherwise having all the qualifications required by the homestead and preëmption laws of the United States, to obtain patents from the United States, each for a half quarter section of said lands within ten miles of the located line of the Leavenworth road, and each for one quarter section of said lands outside of said ten-mile limits, but within twenty miles of said line of road, claimed the right under those laws to take the necessary proceedings and do the acts requisite to obtain title, respectively, to such tracts of land, including most of the lands in the patents mentioned ; that for this purpose sundry of such persons prior to July 26, 1866, and prior to such selections, entered upon, occupied and improved, as required by said laws, a half quarter section of land, within said ten-mile limits, and others each entered upon, occupied and improved, as required by the same laws, some each one-half quarter section of land, and others each a quarter section of such lands ; that sundry of such persons did each do all the acts required by, and in all respects complied with, the homestead and preëmption laws in due time to be entitled to occupy said tracts of half-quarter and quarter sections, respectively, and to receive patents therefor from the United States ; that said persons have ever since been, and still are, each entitled to receive a patent conveying to them respectively said tracts of land so by each occupied and improved, including most of the lands in said patents mentioned : that said persons have, respectively, ever since so entering upon said lands continued

to occupy and hold them, and are ready and willing, and offer to do whatever may be required to procure a patent from the United States; and that the defendants and those under whom they claim title always well knew these facts, and none of them ever took or had possession of any of said lands, but all of them have been in the occupancy and possession of other persons as aforesaid, claiming the right to obtain title thereto from the United States.

The bill, after stating that the Government was unable, at the commencement of the suit, to specify what portions and tracts of land have been settled upon and occupied by actual *bona fide* settlers, as aforesaid, for which patents should be issued, and asking permission to make proof thereof, proceeds to allege that the Missouri-Kansas Company on the —— day of March, 1867, filed its map of definite location in the Department of the Interior; that the Commissoner of the General Land Office, by letter under date of March 19, 1867, directed the receiver and register of the local land office at Humboldt, Kansas, where the above-mentioned lands were subject to be taken under the homestead and preëmption laws, to reserve from sale, location or entry of any kind, all the land outside of a line ten miles from the line of location of the said Missouri-Kansas Company; and on and after April 3, 1867, the date of the receipt of the above order at the local office, said lands were by them thereafter unlawfully reserved from sale, location or entry; that the lands so withdrawn from sale, location and entry, include numerous tracts described in the patents in question; and that on and after April 3, 1867, said register and receiver each unlawfully proclaimed and made known their refusal to permit any citizen or settler to do any act to procure any title to any of such lands under any law, and they each refused to do or permit to be done by any citizen or settler any act requiring their official action or sanction to procure a right or title to them.

Notwithstanding this — the bill further alleges — a large number of citizens of the United States, each over the age of twenty-one years, and otherwise having all the qualifications required by said homestead and preëmption laws, both prior

to and on and after April 3, 1867, and prior to any selection of such lands by or in favor of the railroad company, each went upon, occupied and improved half quarter and quarter sections of land as aforesaid, and some of them each complied with the homestead and preëmption laws, and did every act necessary to procure patents for the lands so occupied by them, respectively, except only that the receiver and register would not permit any act to be done with or by them officially for the purpose of procuring title; that said persons, who have made large and valuable improvements upon the lands so occupied by them, have continued ever since to occupy and claim them and a right to perfect their respective titles, and have always been and are ready and willing to do all acts required to entitle them to patents; and that the Missouri-Kansas Company has sold or agreed to sell to various persons, named as defendants herein, the lands so described, which are claimed by such defendants in fee or under such agreement, or under mortgages, but with notice of the rights of the United States and of said claimants under the homestead and preëmption laws.

If the facts are as thus alleged, it is clear that the Missouri-Kansas Company holds patents to land both within the place and indemnity limits of the Leavenworth road which equitably belong to *bona fide* settlers who acquired rights under the homestead and preëmption laws, which were not lost by reason of the Land Department having, by mistake or an erroneous interpretation of the statutes in question, caused patents to be issued to the company.   The case made by the above admitted averments of the bill is one of sheer spoliation upon the part of the company of the rights of settlers, at least of those whose rights attached prior to the withdrawal of 1867; whether of others, it is not necessary, at this time, to determine.   It is true that the bill is not as full as it might have been in respect to the persons who are alleged to have acquired superior rights under the homestead and preëmption law, or as to the particular tracts of land they claimed or occupied, or as to the dates when such homestead and preëmption rights respectively accrued.   And if application had been made for a bill of par-

ticulars, it should have been granted. But there was no specific objection to the bill upon that ground. The defendants rested the case upon a general demurrer for want of equity, and it must be determined, in its present shape, upon the theory that the facts are as alleged in the bill. The argument on this branch of the case, by counsel for the railroad company, proceeds, in part, upon the assumption that there was no such compliance with the homestead and preëmption laws as would give any of the settlers, referred to in the bill, the rights claimed for them in this suit. Indeed, one of the counsel insists that such settlers have no existence except in the bill filed by the Government. And many other suggestions are made that depend upon matters of which we cannot, upon this record, take cognizance. We must take the case to be that which is presented by the bill, and give judgment accordingly. The defendants, by their demurrers, admit that the settlers, referred to in the bill, did all that the laws of the United States required in order to give them the rights which, the bill alleges, belong to them, and in disregard of which the patents in question were issued. If the railroad company chose to invite a decision upon such a case, it must abide the consequences.

That the case, as now presented, is one of equitable cognizance, we do not doubt. This question must be determined with reference to the equity jurisdiction of the courts of the United States, and not by reference to the remedies given by the local law. As to some of the lands, so far as we can judge by the averments of the bill, the United States has a direct interest in them. As to others, it is under an obligation to claimants under the homestead and preëmption laws to undo the wrong alleged to have been done by its officers, in violation of law, by removing the cloud cast upon its title, by the patents in question, and thereby enable it to properly administer these lands, and to give clear title to those whose rights, under those laws, may be superior to those of the railway company. A suit, therefore, to obtain a decree annulling the patents in question, so far as it is proper to do so, was required by the duty the Government owed as well to the

public as to the individuals who acquired rights, which the patents, if allowed to stand, may defeat or embarrass.

In *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, 286, which was a suit by the United States to set aside a patent alleged to have been improperly issued, and in which the right of the Attorney General to bring such a suit was denied, this court held that such an action could be maintained where it appeared that there was an obligation on the part of the United States to the public, or to any individual, or where it had any interest of its own. In the recent case of *United States* v. *Beebe*, 127 U. S. 338, 342, it was said: "And it may now be accepted as settled that the United States can properly proceed by bill in equity to have a judicial decree of nullity and an order of cancellation of a patent issued in mistake, or obtained by fraud, where the Government has a direct interest, or is under an obligation respecting the relief invoked. . . . Even if it had not been thus authoritatively settled, it would have been difficult, upon principle, to reach any other conclusion. The public domain is held by the Government as part of its trust. The Government is charged with the duty and clothed with the power to protect it from trespass and unlawful appropriation, and, under certain circumstances, to invest the individual citizen with the sole possession of the title which had till then been common to all the people as the beneficiaries of the trust. If a patent is wrongfully issued to one individual which should have been issued to another, or if two patents for the same land have been issued to two different individuals, it may properly be left to the individuals to settle, by personal litigation, the question of right in which they alone are interested. But if it should come to the knowledge of the Government that a patent has been fraudulently obtained, and that such fraudulent patent, if allowed to stand, would work prejudice to the interests or rights of the United States, or would prevent the Government from fulfilling an obligation incurred by it, either to the public or to an individual, which personal litigation could not remedy, there would be an occasion which would make it the duty of the Government to institute judicial proceedings to vacate such patent.

In the case before us, the bill avers that the patents, whose cancellation is asked for, were obtained by fraud and imposition on the part of. the patentee, Beebe. It asserts that there exists, on the part of the United States, an obligation to issue patents to the rightful owners of the lands described in the bill; that they cannot perform this obligation until these fraudulent patents are annulled, and that they therefore bring this suit to annul these fraudulent instruments, whose existence renders the United States incapable of fulfilling their said prior obligation." These principles equally apply where patents have been issued by mistake, and they are specially applicable where, as in the present case, a multiplicity of suits, each one depending upon the same facts and upon the same questions of law, can be avoided, and where a comprehensive decree, covering all contested rights, would accomplish the substantial ends of justice.

Much was said at the bar as to the bearing upon the present case of the decision in *Kansas City &c. Railroad* v. *The Attorney General*, 118 U. S. 682. That was a suit by the United States to cancel certain patents issued to the Missouri-Kansas Company for lands selected, under the direction of the Secretary of the Interior, to indemnify that company for losses by reason of previous appropriations or sales of lands in place limits. It appears from the record of that case that the lands, so selected and patented, were *odd*-numbered sections within the *overlapping indemnity* limits of the grants made by the above acts of 1863 and 1866. As the Atchison and Leavenworth Companies were equally entitled, under the act of 1863, to obtain indemnity from the *odd*-numbered sections, within their. respective *overlapping indemnity* limits; as the Atchison Company assigned its rights, under the acts of 1863 and 1864, to the Missouri-Kansas Company; and as it was shown that the Leavenworth Company had relinquished its right, title and interest in the lands involved in that suit, to the Missouri-Kansas Company; nothing, it would seem, stood in the way of the selection of the above *odd*-numbered sections as indemnity lands for the latter company; provided, the assignment by the Atchison Company to the Missouri-Kansas

Company was valid for the purposes for which it was made, and provided, also, the acts of 1863, 1864 and 1866 were to be construed as *in pari materia*, and having a single object, namely, the building of one road down the Neosho Valley to the point of intersection with the Leavenworth road. The court held that the acts were to be so construed, and that the assignment by the Atchison Company, being approved by the State of Kansas and by Congress in the passage of the act of 1866, was valid. The right of the Missouri-Kansas Company to indemnity from the *odd*-numbered sections within the overlapping indemnity limits of that company and of the Leavenworth Company was, therefore, upheld. There is nothing in that decision to sustain the proposition that the Missouri-Kansas Company could obtain indemnity from the *even*-numbered sections within the *place* limits of the Leavenworth road, which, as we have seen, were reserved to the United States by the act of 1863 for specific purposes, and, therefore, were excluded from the operation of the act of 1866. Nor does that case determine the question as to the right of the Missouri-Kansas Company to indemnity from the *even*-numbered sections within the common indemnity limits of that and the Leavenworth road to which claims of settlers had not attached before their actual selection by proper authority for that company. That right is sustained upon the grounds heretofore stated in this opinion, which are entirely apart from those upon which is based the decision in the other case in reference to the *odd*-numbered sections there in dispute.

Only one other matter, referred to in the bill, is of sufficient consequence to require notice. The demurrers were general for the want of equity; and as what we have said leads to a reversal of the decree, it is unnecessary to express an opinion as to that part of the bill alleging that the Missouri-Kansas Company had, before the bringing of this suit, December 5, 1887, received patents for 252,929.14 acres, more or less, in excess of what it was or is entitled to receive. We adopt this course because the paragraph of the bill relating to this alleged excess is not sufficiently full and explicit to justify a consideration, at this time, of the question it attempts to raise. Besides,

the act of March 3, 1887, required an immediate adjustment
by the Secretary of the Interior of all unadjusted land grants
made in aid of the construction of railroads. 24 Stat. 556, c.
376. We are informed by the brief of one of the defendants'
counsel, that there has been a final adjustment of the grants
made for the benefit of the Missouri-Kansas Company, and that
such adjustment shows that there is a very large deficiency
in lands due to that company. Whether the lands already
patented to the railroad company are in excess of what it was
entitled to receive, and what effect such a fact, if established,
will have upon the present suit, are questions which can be
better determined after the issues between the parties are
fully made up and the evidence all taken.

> *The decree is reversed and the cause remanded with direc-*
> *tions to overrule the several demurrers to the bill, and to*
> *require answers from the defendants, and for other pro-*
> *ceedings not inconsistent with this opinion.*