# UNITED STATES *v.* NORTHERN PACIFIC RAILROAD COMPANY.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

No. 135.  Argued December 14, 1893. — Decided March 5, 1894.

Congress contemplated by the act of July 2, 1864, 13 Stat. 365, " granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound, on the Pacific coast, by the northern route " the construction of a main trunk line, which would not touch at any point at or near Portland, and the western end of which would be east and northeast of a direct line between Portland and Puget's Sound; and also of a branch line leaving the main trunk line at some suitable place, not more than three hundred miles from its western terminus, and extending, *via* the valley of the Columbia River, to a point at or near Portland.

As to Portland, the purpose of Congress by the passage of that act was, to connect it with the east by a branch road through the valley of the Columbia that would strike a main trunk line connecting Puget's Sound with Lake Superior, and not to connect Portland with Puget's Sound by the most eligible route between those places.

The grant to the Oregon Central Railroad Company by the act of May 4, 1870, c. 69, 13 Stat. 94, had taken effect before the grant to the Northern Pacific Railroad Company by the joint resolution of May 31, 1870, 16 Stat. 378, was made, and consequently the lands in question in this case were not included in that grant to the Northern Pacific Railroad Company.

When the lands so granted to the Oregon Central Railroad Company were forfeited to the United States, they were thereby restored to the public domain, and did not pass to the Northern Pacific Company by the said grant of May 31, 1870.

THE case is stated in the opinion.

*Mr. Solicitor General* for plaintiffs in error.

*Mr. James McNaught*, (with whom was *Mr. Fred. M. Dudley* on the brief,) for defendants in error.

Mr. Justice Harlan delivered the opinion of the court.

This writ of error brings up for review a judgment in favor of the defendants in error in an action brought by the United States to recover the value of certain lumber manufactured from logs alleged to have been unlawfully cut and removed by them, in the year 1886, from the public lands, namely, from the northwest quarter of section seven, township eight north, range five west of the Willamette meridian, in the then Territory of Washington. It was adjudged below, upon a special finding of facts, that, at the time of the alleged wrong, the title to these lands had passed from the United States, and that the defendant, Aaron Kinney, was then the owner of them. 41 Fed. Rep. 842. If the title had so passed, the judgment must be affirmed; otherwise, reversed.

From the special finding, based upon a written stipulation between the parties, the case is as follows:

By an act of Congress, of July 2, 1864, the Northern Pacific Railroad Company was incorporated, with authority to construct and to maintain a continuous railroad and telegraph line, " beginning at a point on Lake Superior, in the State of Minnesota or Wisconsin, thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the forty-fifth degree of latitude, to some point on Puget Sound, with a *branch via the valley of the Columbia River, to a point at or near Portland,* in the State of Oregon, *leaving the main trunk line* at the most suitable place, not more than three hundred miles from its western terminus." The same act granted to the company every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections of land per mile, on each side of its line, as the company should adopt, through the territories of the United

States, and the alternate sections per mile where the road passes through any State, "and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption, or other claim or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."    By the sixth section it is provided that "the President of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or preëmption before or after they are surveyed, except by said company, as provided in this act."    13 Stat. 365, c. 217, §§ 1, 3, 6.

On the 6th day of March, 1865, Josiah Perham, president of the Northern Pacific Railroad Company, addressed to the Secretary of the Interior a communication in these words: "Under authority from the board of directors of the Northern Pacific Railroad Company, I have designated on the accompanying map, in red ink, the general line of their railroad from a point on Lake Superior, in the State of Wisconsin, to a point on Puget Sound in Washington Territory, *via* Columbia River, adopted by said company as the line of said railroad, subject only to such variations as may be found necessary after more specific surveys; and I respectfully ask that the same may be filed in the office of the Commissioner of the General Land Office, together with a copy of the charter and organization of said company, and that under your directions the lands granted to said company may be marked and withdrawn from sale in conformity to law."

The route indicated by the map was entirely north of the 45th degree of north latitude, and within the territory of the United States, but no action was taken by the Secretary of the Interior in respect to that map or the request contained in the communication of Mr. Perham.

By a joint resolution of Congress, approved April 10, 1869, it was provided that "the Northern Pacific Railroad Company be, and hereby is, authorized *to extend* its *branch* line from a point *at or near Portland,* Oregon, to some suitable point on Puget Sound, to be determined by said company, and also to connect the same with its *main* line *west of the Cascade Mountains* in the Territory of Washington; said extension being subject to all the conditions and provisions, and said company in respect thereto being entitled to all the rights and privileges conferred by the act incorporating said company, and all acts additional to and amendatory thereof: *Provided,* That said company shall not be entitled to any subsidy in money, bonds, or additional lands of the United States in respect to said *extension* of its *branch* line as aforesaid, *except such lands* as may be included *in the right of way* on the line of such extension as it may be located: *And provided further,* That at least twenty-five miles of said extension shall be constructed before the second day of July, eighteen hundred and seventy-one, and forty miles per year thereafter, until the whole of said extension shall be completed." 16 Stat. 57.

On the 4th day of May, 1870, Congress, for the purpose of aiding in the construction of a railroad and telegraph line from Portland to Astoria, and a suitable point of junction near Forest Grove to the Yamhill River near McMinnville, in the State of Oregon, granted to the " Oregon Central Railroad Company, a corporation of Oregon, then engaged in constructing said road, and to their successors and assigns, a right of way, etc.; . . . and, also, each alternate section of the public lands, not mineral, except coal or iron lands, designated by odd numbers, nearest to said road, to the amount of ten such alternate sections per mile on each side thereof, not otherwise disposed of or reserved or held by valid preëmption or homestead right at the time of the passage of this act.

And in case the quantity of ten full sections per mile cannot be found on each side of said road, within the said limits of twenty miles, other lands designated as aforesaid shall be selected under the direction of the Secretary of the Interior on either side of any part of said road nearest to and not more than twenty-five miles from the track of said road to make up said deficiency." That act further provided : " That the Commissioner of the General Land Office shall cause the lands along the line of the said railroad to be surveyed with all convenient speed. And whenever and as often as the said company shall file with the Secretary of the Interior maps of the survey and location of twenty or more miles of said road, the said Secretary shall cause the said granted lands adjacent to and coterminous with such located sections of road to be segregated from the public lands ; and thereafter the remaining public lands, subject to sale within the limits of the said grant, shall be disposed of only to actual settlers at double the minimum price for such lands." The company was required to file within one year after its passage, and with the Secretary of the Interior, its assent to the act ; and it was made a condition of the grant that a section of twenty or more miles of the proposed railroad and telegraph line be constructed within two years, and the entire road and telegraph line within six years from the same date. 16 Stat. 94, c. 69.

The Oregon Central Railroad Company filed with the Secretary of the Interior its acceptance of the above grant — on what day the findings of fact do not state — and on the 31st of January, 1872, filed its map of definite location of a proposed line of road from Astoria to Castor Creek, near Forest Grove. It is stated in the findings of fact that the only provision in the charter of the Oregon Central Railroad Company, at the time of the above grant to it, conferring power or right to locate and construct a railroad, was that contained in the following clause : " The object and business of the corporation shall be to construct and operate a railroad from the city of Portland through the Willamette Valley to the southern boundary of the State, under the laws of Oregon

and the law of Congress recently passed granting lands in aid of such purpose."

On the 31st day of May, 1870, twenty-seven days *after* the date of the above grant to the Oregon Central Railroad Company, Congress passed a joint resolution providing: "That the Northern Pacific Railroad Company be, and hereby is, authorized to issue its bonds to aid in the construction and equipment of its road, and to secure the same by mortgage on its property and rights of property of all kinds and descriptions, real, personal, and mixed, including its franchise as a corporation; . . . and also *to locate* and construct, under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its *main* road to some point on Puget Sound *via* the valley of the Columbia River, with the right to locate and construct its *branch* from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any State or Territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by Congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the Secretary of the Interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such State or Territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, preëmpted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four. And that twenty-five miles of said main line between its western terminus and the city of Portland, in the State of Oregon, shall be completed by the first day of January, Anno Domini eighteen hundred and seventy-two, and forty miles of the remaining portion thereof each year thereafter until the whole shall be completed between said points." 16 Stat. 378.

The Northern Pacific Railroad Company filed with the Secretary of the Interior and the Commissioner of the General Land Office on the 13th day of August, 1870, another map, showing the general route of its main line from a point on Puget Sound, following almost identically the same route as that indicated on the map filed by it on the 6th day of March, 1865; and on the day of the filing of the last map, to wit, August 13, 1870, twenty sections of land per mile on each side of the line indicated on it were withdrawn from sale for the benefit of the company. And on the 13th day of September, 1873, the company duly filed its map of definite location of the line of its road from Kalama to Tenino, in Washington Territory, a distance of sixty-five miles. No road has been constructed by that company down the Columbia River. But during the years 1871, 1872, and 1873 it constructed its line from Kalama, on the Columbia River in Washington Territory, in a northerly direction to Tenino, forming a portion of a direct line of road since that time extended and completed to Puget Sound at Tacoma, the western terminus of the Northern Pacific Railroad. The road from Tacoma to Portland runs for about one-half the distance up the valley of Columbia River to the last-named point, the entire length of that line being 105 miles.

During the years 1872 to 1880 a line of road was constructed by the Oregon Central Railroad from Portland southward through the Willamette Valley towards the southern boundary of the State to Corvallis in that valley, a distance of about ninety-seven miles, which road, so constructed, passed through McMinnville and near Forest Grove. But no line was ever constructed by that company from a point of junction near Forest Grove to the Yamhill River or elsewhere.

The land from which the logs in question were cut lies north of the 45th degree of latitude within twenty miles of the line indicated upon the map filed, January 31, 1872, by the Oregon Central Railroad Company with the Secretary of the Interior; is within forty miles of the line selected by the Northern Pacific Railroad Company for the main line of its

road from Lake Superior to Puget Sound by way of the valley of the Columbia River, as indicated upon the map forwarded to the Secretary of the Interior by that company on the 6th of March, 1865, as well as of the line selected by it, after the passage of the joint resolution of May 31, 1870, as the main line of its road down the Columbia River to Puget Sound, as indicated upon the map filed with the Secretary of the Interior on the 13th day of August, 1870; and is within the same distance of the line of road as constructed from Kalama to Tenino.

Congress, by an act approved January 31, 1885, forfeited to the United States, and restored to the public domain, so much of the lands granted to the Oregon Central Railroad Company by the act of March 4, 1870, as were adjacent to and coterminous with the uncompleted portions of that company's road and not embraced within the limits of the grant to 'that company for the completed portions. 23 Stat. 296, c. 46, § 1.

The lands in question (and other tracts) were listed by the Northern Pacific Railroad Company on March 31, 1885, but the General Land Office, November 9, 1885, rejected the listing. Upon appeal to the Department of the Interior that action was confirmed October 29, 1887. 6 L. Dec. 292.

After the withdrawal of the above lands in the interest of the Northern Pacific Railroad Company, in August, 1870, and up to November 9, 1885, the Land Office and the Department of the Interior refused all applications for settlement upon lands north of the Columbia River within the limits of the grant to that company.

The Northern Pacific Railroad had located, constructed, and was operating its road from Portland to Tacoma at the time it executed a deed for this land to J. B. Montgomery, the "grantee" of the defendant Aaron Kinney.

The general conclusion of law from the above facts was declared by the Circuit Court to be that upon the filing its map of general location, and the subsequent completion by the Northern Pacific Railroad Company of its road, the title to the land in question vested indefeasibly in that corpora-

tion, and by subsequent conveyances passed to the defendant Kinney.

The first and principal question is, whether the act of July 2, 1864, contained a grant of lands in aid of the construction by the Northern Pacific Railroad Company of a railroad and telegraphic line *from Portland* to Puget Sound ?

Although that act allowed the company to adopt the most eligible route, within the territory of the United States, north of the forty-fifth degree of latitude, it is clear that Congress contemplated the construction of a main trunk line between Lake Superior and Puget Sound, which would not touch any point " at or near Portland," and the western end of which would be east and northeast of a direct line between Portland and Puget Sound, and, in addition, a branch line leaving the main trunk line, at some suitable place, not more than three hundred miles from its western terminus, and extending " *via* the valley of the Columbia River to a point at or near Portland." If the main line, as originally indicated by the act of 1864, had been established on the route between Portland and Puget Sound, the branch line could not have left the main line at some point not more than three hundred miles from its western terminus, and extended *via* the valley of Columbia River to a point at or near Portland. The authority given to the company to adopt the most eligible route did not authorize it, by a map of general route, to cover an unlimited extent of country, north of the forty-fifth degree of latitude. On the contrary, as said in *St. Paul & Pacific Railroad* v. *Northern Pacific Railroad,* 139 U. S. 1, 13, " when the termini of a railroad are mentioned, for whose construction a grant is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant." It may be that the indefiniteness of the map of general route presented by the Northern Pacific Railroad Company in 1865 constituted the reason why that map was not accepted

by the Interior Department.   Besides, it is not found as a fact in this case that the most eligible railroad route for the main line, between Lake Superior and Puget Sound, looking at the purpose of Congress in making the grant of 1864, was down the Columbia River and *via* some point at or near Portland.   It is clear that the purpose of Congress, by the act of 1864, was not to connect Portland with Puget Sound, by a road established upon the most direct or eligible route between those places; but, so far as Portland and its vicinity were concerned, to connect them with the east by a branch road, through the valley of the Columbia River, that would strike the main trunk line connecting Puget Sound and Lake Superior.   There was no purpose, *by that act*, to make a grant of lands for a road to be located and constructed from a point " at or near Portland " to Puget Sound.

This interpretation of the act of 1864 is supported by the joint resolution of April 10, 1869, authorizing the Northern Pacific Railroad *to extend* " its *branch* line from a point *at or near Portland, Oregon, to some suitable point on Puget Sound*," and " also to connect the same with its main line *west of the Cascade Mountains, in the Territory of Washington.*"   By the same resolution it was expressly declared that the company should not be entitled to any subsidy in money, bonds, or additional lands of the United States, in respect to that extension of its branch line, except such lands as might be included *in the right of way* on the line of such extension. It is said that the company did not take action under this resolution, and did not accept it in any form.   Be this as it may, — upon this point the finding of facts being silent, — the resolution of 1869 shows that Congress, at that time, to the knowledge, it must be presumed, of the railroad company, interpreted the act of 1864 as not containing a grant of lands to aid in the construction of a road from Portland to Puget Sound.

Coming next to the joint resolution of May 31, 1870, which was accepted and acted upon by the company, we find, in connection with authority to issue bonds in aid of the construction and equipment of its road, to be secured by mort-

gage, that express authority was given, for the first time, to the Northern Pacific Railroad Company " to locate and construct under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its *main* road to some point on Puget Sound, *via* the valley of the Columbia River, with the right to locate its *branch* from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound." Again, in the same resolution : " And that twenty-five miles of said main line between its western terminus and the city of Portland, in the State of Oregon, shall be completed by January 1, 1872, and forty miles of the remaining portion thereof each year thereafter until the whole shall be completed between said points." Undoubtedly, this resolution gave authority to locate and construct a main road *via* the Columbia River Valley to Puget Sound. A road so located and constructed would, or might, have passed the city of Portland. But if, as the company now insists, the act of 1864 gave ample authority to locate and construct a road ·extending from Lake Superior' to Puget Sound, along the valley of the Columbia River, *and by the way of Portland or its vicinity*, the resolution of 1870 was entirely unnecessary in so far as it gave authority to the company to locate and construct its road through the Columbia River Valley to some point on Puget Sound. We cannot agree that this resolution is to be held, in this respect, as simply a recognition by Congress of an existing right, in the company, to locate and construct a road from Portland to Puget Sound, with the right to obtain lands, in aid thereof, as provided in the act of 1864. On the contrary, it should be regarded as giving a subsidy of lands in aid of the construction of a *new* road, not before contemplated, that would directly connect Portland and its vicinity with Puget Sound.

This view is supported by the action of the Interior Department in the case of the *Northern Pacific Railroad Co.* v. *McRae*, 6 L. Dec. 400. The question there was, whether the company had a grant of lands for its road *from Portland* to Puget Sound. The Commissioner of the Land Office held that the company had no grant for that portion of its road

from or near Portland to Puget Sound. Upon appeal by the company to the Secretary of the Interior, that ruling was reversed. Mr. Justice Lamar, then Secretary of the Interior, after referring to the act of 1864, and to the joint resolution of May 31, 1870, well said : " By this resolution the designation of the lines of the road were changed; that which by the granting act was known as the branch line (*via* the valley of the Columbia River to a point at or near Portland in the State of Oregon) was changed to main road, or main line, and that which had been designated as main line (across the Cascade Mountains to Puget Sound) was changed to branch line. So, by the joint resolution of 1870 the company was authorized to locate and construct its main line *via* the valley of the Columbia River, through some point at or near Portland, Oregon, to a suitable point on Puget Sound, with the privileges, grants, and duties provided for in its act of incorporation. Now, the grant provided for in its act of incorporation is every alternate section of public land not mineral, (except coal and iron,) designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad whenever it passes through any State. I am clearly of opinion that by the joint resolution of May 31, 1870, Congress intended that the grant of twenty sections per mile on each side of the road to aid in the construction of said road should be extended to the whole line of the road including that part of the main line *via* the valley of the Columbia River through Portland to Puget Sound. This conclusion, based alone upon the language of the joint resolution, would be confirmed, if confirmation were necessary, by the debates in Congress upon said resolution while it was pending, and make clear the manifest purpose of said resolution."

It cannot be inferred from the opinion of Mr. Justice Lamar[1] that the company, in the case before him, contended

---

[1] The part of the opinion of Mr. Justice Lamar which refers, in detail, to the debates in Congress on the resolution of May 31, 1870, is as follows :

"In the course of the debate Senator Howard said : ' It asks no more at the hands of Congress, as I said before, than what is promised to them in their original charter of 1864 — not a single acre, I repeat, with the excep-

that it had a grant of land for any line, whether main or branch, between Portland and Puget Sound, except that made by the joint resolution of May 31, 1870.

But does the grant contained in the resolution of 1870 embrace the particular land in dispute? The act of 1864 granted to the Northern Pacific Railroad Company only public land, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from preëmption or other claims or rights at the time its line of road was definitely fixed, and a plat thereof filed in the office of the Commissioner of the General Land Office. And by the resolution of 1870 it was declared that if at the time of the final

tion of the *new* donations upon the line *from Portland to Puget Sound,* which is authorized by this resolution. That line from Portland to Puget Sound *was not embraced in the original charter.* It was authorized and the right of way given to this company at the last session of Congress, (joint resolution of April 10, 1869,) but simply the right of way and no lands to enable the company to build it. On that line, and on that alone, are lands required additional to those contemplated in the original charter.' Cong. Globe, 41st Congress, 2d Sess. p. 2546. As reported from the committee, the resolution contained this language: ' Under the provisions and with the privileges and duties provided for in its act of incorporation and amendment thereto.' During the debate in the Senate, Mr. Howard said: ' I now move to strike out in the fifteenth line the words, " and the amendments thereto," so as to make it sure that this *new* line, which is to pass *from Portland to Puget Sound,* will be entitled to the subsidy in lands; otherwise it might leave it very uncertain.' The amendment was agreed to. (Page 2583.). Subsequently, Senator Howard moved to amend the sentence, ' under the provisions and with the privileges and duties provided for in its act of incorporation,' by inserting after the word ' privileges ' the word ' grants,' saying, ' so as to remove any ambiguity that might arise.'

" In the House, in reply to the question, How much additional land will be granted should this bill become a law ? Mr. Wheeler said: ' That depends upon the fact whether the lines will be longer than the original ones. This can only be determined by actual survey. If more land is taken, it will be only for the additional distance and for the quantity per mile granted by the charter.' (Page 3263.) Mr. Wilson said: ' This is no increase of land over that which has already been given to this road. It only gives them additional land for an additional piece of road, which they now propose to construct from Portland up to Puget Sound. The old grant is not increased one acre.' (Page 3266.) I am clearly of the opinion that the Northern Pacific Railroad Company has a grant of lands from Portland to Puget Sound, (Tacoma,) and your decision is, therefore, reversed."

location of the company's main line or branch there were not enough lands per mile within the prescribed limits, the deficiency could be supplied from lands, within ten miles beyond those limits, other than mineral and other lands, as excepted in the charter of the company, "to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, preëmpted, or otherwise disposed of subsequent to the passage of the act of July 2, 1864." It is, therefore, clear that no public land disposed of after the passage of the act of July 2, 1864, was intended to be embraced in the grant of May 31, 1870.

The lands here in question were disposed of by the United States after the passage of the act of 1864, and before the

---

In addition to what appears in the opinion of Mr. Justice Lamar, it may also be stated that Senator Stewart of Nevada, in supporting the resolution, said: "There is no grant additional to that contained in the original law, *except in the extension of the road on the western end from Portland to Puget Sound.*" 41st Cong. 2d Sess. Pt. 3, p. 2543. Senator Sherman: "The first part of this bill gives the company authority to make a mortgage, . . . and it also provides for a *new* land grant *from Portland to Puget Sound.*" In answer to inquiries by Senator Thurman, Senator Howard, having the resolution in charge, stated that its passage was earnestly desired by the Northern Pacific Railroad Company. Senator Thurman inquired whether, if the proposed resolution passed, "the main line must diverge down the Columbia River at the same point at which the branch would diverge under the original charter?" To this Senator Howard replied: "I think that would be the construction to be given to the two acts together, the charter and the present resolution." He then said: "I now move to strike out, in the fifteenth line, the words *and amendments thereto,* so as to make it sure that this *new* line, which is to pass *from Portland to Puget Sound, will be entitled to the subsidy in lands.*" This motion was adopted. Ib. p. 2546. In the House of Representatives, Mr. Wheeler, Chairman of the Committee on Railroads, from which the resolution was reported, said, in explanation of its provisions: "Second. The company wants to change the route of the main line and branch as defined by the original act of incorporation. It wants *now* to build its *main line by the way of the valley of the Columbia River instead of over the Cascade Mountains, as intended at the outset.* . . . The route by the valley of the Columbia River is far the more feasible, and can be built in much shorter time and with the means which this bill will enable the company to command. This change takes the road direct to Portland, thus giving it business when it is completed to that point, and enabling it to use the river for the transportation of materials during the progress of construction." 41st Cong. 1st Sess. Pt. 4, p. 3263.

passage of the joint resolution of May 31, 1870; for they are within twenty miles of the line of the Oregon Central Railroad Company, as shown on its map of definite location, filed January 31, 1872, and based upon the grant to it of May 4, 1870. It is true that the Northern Pacific Railroad Company, on the 13th day of August, 1870, acting under the joint resolution of May 31, 1870, filed a map of the general route of its main line from a point on Puget Sound; that, on the same day, twenty sections per mile on each side of the line indicated on it were withdrawn from sale for the benefit of the company; and that this was followed by a map, filed September 13, 1873, of the definite location of its line from Kalama to Tenino. But it is well settled that, in respect to the public lands, within, at least, common granted or primary limits, priority of grant, not priority of location, determines the question of ownership, as between parties claiming the same lands under different grants. *Missouri, Kansas and Texas Railway* v. *Kansas Pacific Railway*, 97 U. S. 491; *United States* v. *Missouri &c. Railway*, 141 U. S. 358, 369; *United States* v. *Southern Pacific Railroad*, 146 U. S. 570, 598, 606.

So that the rights of the Oregon Central Railroad Company, whose grant preceded that to the Northern Pacific Railroad Company of May 31, 1870, by nearly one month, attached, as of the date of its grant, although the latter company filed a map of general route before the former filed a map of definite location. The lands in question had been disposed of by the United States prior to the passage of the joint resolution of May 31, 1870, namely, by the act of May 4, 1870, granting lands to the Oregon Central Railroad Company in aid of the construction of its road. And as they were embraced by the latter grant, and were not included in any other grant then existing, they were not public lands within the meaning of the grant of May 31, 1870, to the Northern Pacific Railroad Company, and were, consequently, excepted out of that grant as having been previously disposed of by the United States.

When, therefore, Congress by the act of 1885, forfeited to the United States and restored to the public domain so much

of the lands granted by the act of May 4, 1870, for the benefit of the Oregon Central Railroad Company, as were adjacent to and coterminous with the uncompleted portions of the road, the United States was reinvested with the title for its own benefit exclusively. And the title did not pass to the Northern Pacific Railroad Company by reason of the failure of the Oregon Central Railroad Company to construct its road, or because of the subsequent forfeiture of the latter's rights by the act of 1885. The restoration to the public domain of the lands so forfeited took from the Northern Pacific Railroad Company no lands granted to it by the act of 1870. In *United States* v. *Southern Pacific Railroad Co.*, 146 U. S. 570, 606, in which one of the questions was as to the right of the Southern Pacific Railroad Company to appropriate lands that had been previously granted to the Atlantic and Pacific Railroad Company, but which lands were forfeited by Congress, after the date of the grant to, and the filing of the map of definite location by, the former company, this court said: " So when intent is to be considered, the question is whether Congress intended, the title having once vested in the Atlantic and Pacific, that the Southern Pacific Company should stand waiting to take the lands at some future time, however distant, when the Atlantic and Pacific Company's title should fail. Again, there can be no question, under the authorities heretofore cited, that if the act of forfeiture had not been passed by Congress, the Atlantic and Pacific could yet construct its road, and that, constructing it, its title to these lands would become perfect. No power but that of Congress could interfere with this right of the Atlantic and Pacific. No one but the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It enacted that they be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific; it was not to enlarge its grant as it stood prior to the act of forfeiture. It had given to the Southern Pacific all that it had agreed to in its original grant; and now, finding that the Atlantic and Pacific was guilty of a breach of a con-

dition subsequent, it elected to enforce a forfeiture for that breach and a forfeiture for its own benefit."

One other point pressed by the defendant deserves notice. It is that the Oregon Central Railroad Company was without power under its charter to construct a railroad from Portland to Astoria, and, therefore, could not obtain the benefit of the grant made by Congress of the lands in dispute. That corporation is not here seeking the aid of the court to invest it with title to real estate it could not legally acquire for the purposes of its charter. If it were, it might be the duty of this court to inquire as to its right, under the laws that created it, to take and hold such title. *Case* v. *Kelly*, 133 U. S. 21. The question is whether Congress embraced these lands in its grant to that company of May 4, 1870. If it did, then the title passed to it from the United States, subject to be defeated by breach of condition subsequent and subject, it may be, to any proceeding the State of Oregon might institute to compel a corporation created by its laws to keep within the limits of the powers granted to it. Whether the Oregon Central Railroad Company could, under its charter, take title to those lands was and is a matter that concerned only that corporation and the State of Oregon. It is sufficient, for this case, to say that the lands here in dispute were not included in the grant of 1864 or in that of May 31, 1870, to the Northern Pacific Railroad Company. If, as we hold, Congress did not intend to include them in the latter grant, and even if we should also hold that the Oregon Central Railroad Company was incompetent, under its charter, to take title to them, the lands, never having been granted prior to May 4, 1870, to any corporation, would not, contrary to the intention of Congress, have fallen under the grant of May 31, 1870, to the Northern Pacific Railroad Company, but would have remained part of the public domain.

It results that the court below erred, and that judgment should have been rendered for the United States.

*The decree is reversed, and the cause remanded with directions to enter judgment for the United States, upon the special finding of facts.*