DE LACEY v. NORTHERN PAC. R. CO. et al.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1896.)

No. 244.

RAILROAD LAND GRANTS—EXCEPTION OF PRE-EMPTION CLAIMS.
When a grant is made to a railroad company of parts of the public lands, within certain limits, "not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights," at the time of the definite location of the road, the mere existence, at the time of the definite location of the road, of a pre-emption claim to land within the limits of the grant, properly entered on the records of the land office, prevents the grant from attaching to such land, without regard to the validity of such claim; and no title passes to the railroad company by virtue of a patent for the land, issued to it by the government upon a finding that the pre-emption claim had been abandoned.

In Error to the Circuit Court of the United States for the Western Division of the District of Washington.

This was an action of ejectment by the Northern Pacific Railroad Company and others against James De Lacey to recover certain lands in the state of Washington. Judgment was rendered for the plaintiffs in the circuit court. 66 Fed. 450. Defendant brings error. Reversed.

Ballard & Norris and Thos. Carroll, for plaintiff in error.

F. M. Dudley and Jos. D. Redding, for defendants in error.

Before McKENNA and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The Northern Pacific Railroad Company, the defendant in error here, brought this action in the court below to recover from the defendant there, plaintiff in error here, the possession of the S. W. ¼ of the N. W. ¼, the S. E. ¼ of the N. W. ¼, and the E. ½ of the S. W. ¼, of section 21, township 20 N., range 3 E., of Willamette Meridian, situated in the state of Washington, for which that company holds a patent issued by the government of the United States in confirmation of title supposed to have been conferred upon it by the act of congress of July 2, 1864 (13 Stat. 365). By that act, the Northern Pacific Railroad Company was incorporated, with authority to construct and to maintain a continuous railroad and telegraph line—

"Beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin, thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the 45th degree of latitude, to some point on Puget Sound with a branch via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus."

—And granting to the company, in aid thereof, every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections of land per mile on each side of its line, as the company should adopt through the territories of the United States, and 10 alternate sections per mile where the road passes through any state—

"And whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claim or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

The sixth section of the act provided that:

"The president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act."

On the 31st day of May, 1870, congress passed a joint resolution, by which, among other things, the Northern Pacific Railroad Company was authorized—

"To locate and construct, under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget Sound via the valley of the Columbia river, with the right to locate and construct its branch from some convenient point on its

main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four. And that twenty-five miles of said main line between its western terminus and the city of Portland, in the state of Oregon, shall be completed by the first day of January, Anno Domini eighteen hundred and seventy-two, and forty miles of the remaining portion thereof each year thereafter until the whole shall be completed between said points." 16 Stat. 378.

By this resolution, as said by Mr. Secretary Lamar, in Railroad Co. v. McRae, 6 Land Dec. Dep. Int. 400—

"The designations of the lines of the road were changed; that which by the granting act was known as the 'branch line' (via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon) was changed to 'main road' or 'main line,' and that which had been designated as 'main line' (across the Cascade Mountains to Puget Sound) was changed to 'branch line.' So, by the joint resolution of 1870 [May 31], the company was authorized to locate and construct its main line via the Columbia river, through some point at or near Portland, Or., to a suitable point on Puget Sound, with the privileges, grants, and duties provided for in its act of incorporation."

In the case of U. S. v. Northern Pac. R. Co., 152 U. S. 284, 14 Sup. Ct. 598, it was held, among other things, that by the act of July 2, 1864, no land was granted to the Northern Pacific Railroad Company to aid the construction of any line of road between Portland and Puget Sound, and that no public land disposed of by the government after the passage of the act of July 2, 1864, was intended to be embraced in the grant made by the joint resolution of May 31, 1870. The land in controversy lies within the primary limits both of the grant of the main line of the railroad as definitely located, between Portland and Puget Sound, and the line of the Cascade Branch, as definitely located, between the point where it leaves the main line and crosses the Cascade Mountains to Puget Sound. By the resolution of May 31, 1870, lands were granted to the Northern Pacific Railroad Company, to aid the construction of that portion of the road between Portland and Puget Sound. It is undisputed that, at the time of the passage of that resolution, there was upon file, in the local land office of the district where the land in controversy is situated, a valid and subsisting pre-emption claim by one John Flett, which claim operated to except the land from that grant to the railroad company. The question in the case is whether it was also excepted from the grant contained in the act of July 2, 1864, in aid of the line across the Cascade Mountains, then called the "main line," and subsequently made, as has been said, by the joint resolution of May 31, 1870, the "branch line."

It appears from the findings of fact filed by the court below that on April 9, 1869, Flett filed his declaratory statement of his intention to purchase the land in question under the laws of the United States authorizing the pre-emption of unoffered lands, but that whether or not he was then qualified to enter the land under the pre-emption laws was not made to appear at the trial; that in the fall of 1869 he left the land in question, and did not thereafter reside thereon, "although it is recited in the decision of the secretary of the interior, in a contest between the railroad company, De Lacey, Flett, et al., before the interior department, involving the land here in controversy, that in September, 1870, Flett went to the local land office, and told the officers that he had come to prove up on his claim; that they told him it was railroad land, and that he had lost it; that Flett did not then actually offer to make proof, but acquiesced in the advice of the local office that he was not entitled to make proof under his filing"; and that on September 7, 1887, Flett "submitted proof in support of his pre-emption claim, founded upon his declaratory statement filed April 9, 1869." It was also found as a fact by the court below that De Lacey settled upon the land in controversy in April, 1886; that on April 5, 1886, he applied to make homestead entry thereof; that his application was rejected, "for the reason that the land fell within the limits of the grant to the railroad company on both main and branch lines"; that, from this decision of the register and receiver, De Lacey appealed to the commissioner of the general land office; that afterwards, under the instructions of the commissioner, a hearing was had, at which the railroad company, De Lacey, Flett, and one John Algyr, who, it appears, had also sought to file a declaratory statement for the land, were present; that on July 27, 1889, the receiver of the local land office found that Flett had not voluntarily abandoned the land in 1869, and that his entry should be reinstated; that, from this finding, all of the parties named, except Flett, appealed to the commissioner of the general land office, and that, on December 5, 1889, the commissioner sustained the finding of the receiver; that thereafter the adverse parties to the contest appealed to the secretary of the interior,—and that on September 28, 1891, the secretary of the interior reversed the ruling of the commissioner of the general land office, and awarded the land in controversy to the railroad company, in pursuance of which ruling the patent was, on December 13, 1892, issued to the company; that Flett's declaratory statement "was not formally canceled upon the records until December 23, 1891."

It appears from the bill of exceptions that Flett, at the time of filing his declaratory statement, paid to the receiver of the local land office the statutory fee of three dollars therefor, upon which the register of the land office issued and delivered to him his certificate; that on July 15, 1887, Flett gave notice of his intention to make final proof to establish his claim to the land, notice of which was duly published by the register of the land office. In the contest that there arose between Flett, De Lacey,

Algyr, and the railroad company, testimony was taken, which was reviewed by the local officers, and, in turn, by the commissioner of the general land office and the secretary of the interior. The officers of the local land office, in holding that Flett was entitled to make final proof of his right to pre-empt the land, said that it appeared from the testimony that Flett, in 1869,—

"Bought the improvements of a former settler, and moved on the land, claiming it under the pre-emption law; that he continued thereon with his family until the fall of that same year, when he was appointed as blacksmith on the Indian reservation; that he removed with his family from the land, when he received his appointment, and did not return thereto until the following summer; that he continued to cultivate the land, and made, during the years 1869 and 1870, valuable improvements thereon, and in the fall of 1870 he went to the land office to render his final proof, but the register would not listen to him, and finally, upon his insisting, ordered him out of the office, saying that the land belonged to the Northern Pacific Company; that Flett did not pursue the matter further at the time in the way of appeal, and immediately removed from the land, and has not resided thereon since; that no other claim, under any of the settlement laws, appears to have been made until 1873, when John Algyr made his application to file a pre-emption; that the testimony shows that Algyr settled upon the land in 1883, and built a house thereon, but has not resided upon the land since about the year 1884; that James De Lacey settled upon the land in 1886, and has since resided continuously thereon, and has made valuable improvements."

These views of the local office were, as has been said, approved by the commissioner of the general land office, but were overruled by the secretary of the interior, who said, among other things:

"The record shows that Flett made settlement upon the land early in February, 1869, and actually resided upon it, with his family, until November, 1869, when he left it, and removed to other land, upon which he was residing on March 30, 1887, as shown by his answers to interrogatories propounded to him and submitted on the hearing ordered upon the application of Algyr to enter this land. What land this was is not definitely shown by the record, but, considering all the evidence therein taken upon the several hearings, it may be fairly inferred that it was lot 3 in section 30, T. 20 N., R. 5 E., W. M., of which he made homestead entry on February 20, 1874, and made proof and received final certificate therefor June 9, 1880, as shown by the records of the office. It is contended that Flett did not move from the land in controversy until the fall of 1870, and that he cultivated the land in 1871, after the date of the filing of the map of general route. While I am satisfied that the evidence of Flett offered on the hearing upon the application of Algyr shows that he left the land in 1869, yet it may be conceded that he did not leave the land until 1871, because whether he did or did not would not in any manner affect the question as to whether the land was excepted from the withdrawal on general route, inasmuch as the filing of itself, being a prima facie valid pre-emption filing, of record at said date, served to except the land covered thereby from the operation of said withdrawal; and whether the pre-emptor, under such filing, inhabited and improved the land, and performed other duties under the pre-emption law, are questions that cannot be raised by the company in aid of the grant; but, when the statutory period had expired without proof and payment having been made, no presumption arises of the actual existence or continuance of the claim of the pre-emptor under such filing, and, if such a claim is alleged, it must be shown that the pre-emptor had not abandoned the land, and that his right or claim to the land was still existing. Hence, on May 14, 1874, when the road was definitely located, the filing of Flett had expired; and, proof and payment not having been made, the presumption arose that whatever claim had previously attached to the land under or by reason of such filing had been abandoned, and no longer in fact existed."

The secretary proceeded to hold that that presumption was not rebutted by any proof, and accordingly awarded the land to the railroad company.

It is not for us to determine in this case whether Flett or either of the other individuals claiming the disputed land was legally entitled thereto, but the question is whether the land was covered by the grant to the Northern Pacific Railroad Company of July 2, 1864. If it was excepted from that grant, the officers of the land department were without authority to issue a patent therefor to that company. Steel v. Refining Co., 106 U. S. 447–452, 1 Sup. Ct. 389; Smelting Co. v. Kemp, 104 U. S. 636, 641.

It appears from the findings that the map showing the definite location of the line across the Cascade Mountains was filed in the office of the commissioner of the general land office March 26, 1884. The case therefore turns upon the question whether at that time the land in controversy was public land, and therefore passed under the grant of July 2, 1864, to the company, or was excepted therefrom by reason of the declaratory statement of Flett filed April 9, 1869, 'and the proceedings thereunder. The court below held that the pre-emption claim of Flett had been extinguished by abandonment at the time of the definite location of the Cascade Branch, and did not then exist, saying, in its opinion:

"The material fact in this case is that, at the time the line was definitely located, the claim of Flett no longer attached, but had been extinguished. It is immaterial whether it was extinguished by a proceeding in the land office resulting in a cancellation of the entry, or by the voluntary action of the claimant amending his entry and releasing the lands, as in the Amacker Case [7 C. C. A. 518, 58 Fed. 850], or by the abandonment and forfeiture of the claim, as in the case now under consideration. The defendant relies upon the fact that the Flett entry remained uncanceled until 1891. A declaratory pre-emption statement on file prior to and at the time the grant was made would be proof of the intention of congress to exclude from the grant the land covered thereby; and such an entry in the file of the land office, made after the date of the grant, and remaining in existence at the time of the definite location, so as to furnish evidence of a claim that might ripen into a title by compliance with the land laws, would likewise serve to exclude the land from the grant; for it was not the intention of the grant, as construed by the decisions, to permit an inquiry into the bona fides of such a claim, or the performance of the conditions which rested upon the claimant. But here it is not only admitted by both the parties to the action that Flett abandoned and forfeited his claim in 1871; but the very right of the defendant to possess and claim the land is predicated upon such abandonment by Flett and the extinction of Flett's claim. Such an admission must be held to destroy the effect and force of the entry in the land office. The court will not regard the existence of an entry the life of which is admitted to have expired, but must be guided by the admitted fact. It must be held, therefore, that the land in controversy was public land, subject to the grant in 1864, and free from any claim that would exempt it therefrom in 1884, when the line of the road was definitely located."

The fact that the claim of the defendant to the land in controversy is based upon the alleged fact of the abandonment by Flett of his pre-emption claim is, we think, a false quantity, for, the action being ejectment, the question is not whether the defendant thereto has title, but whether the plaintiff has; and, if the record shows that the condition of the land was such at the time of the·

definite location of the line of the road that it was excepted from
the grant to the railroad company, it must necessarily result that
the plaintiff has no title, regardless of who may have.

· As has been seen, there was excepted from the grant to the
Northern Pacific Company, among others, all lands to which there
was a pre-emption claim or right at the time of the definite loca-
tion of the road. This filing of the map of definite location, said
the supreme court, in Railway Co. v. Dunmeyer, 113 U. S. 629–644,
5 Sup. Ct. 566, established the criterion by which the lands to
which the road had a right were to be determined. It also, said
the court, furnished—

· The means of determining what lands had previously to that moment
been sold, reserved, or otherwise disposed of by the United States, and to
which a pre-emption or homestead claim had attached; for, by examining
the plats of this land in the office of the register and receiver, or in the gen-
eral land office, it could readily have been seen if any of the odd sections
within ten miles of the line had been sold, or disposed of, or reserved, or a
homestead or pre-emption claim had attached to any of them. In regard to
all such sections they were not granted. The expressed and unequivocal
language of the statute is that the odd sections 'not' in this condition are
granted. The grant is limited by its clear meaning to the other odd sections,
and not to these. * * * Did congress intend to say that the right of the
company also attaches, and whichever proved to be the better right should
obtain the land? The company had no absolute right until the road was
built, or that part of it which came through the land in question. The home-
stead man had five years of residence and cultivation to perform before his
right became absolute. The pre-emptor had similar duties to perform in
regard to cultivation, residence, etc., for a shorter period, and then payment
of the price of the land. It is not conceivable that congress intended to
place these parties as contestants for the land, with the right in each to re-
quire proof from the other of complete performance of its obligation. Least
of all is it to be supposed that it was intended to raise up,.in antagonism to
all the actual settlers on the soil, whom it had invited to its occupation, this
great corporation, with an interest to defeat their claims, and to come be-
tween them and the government as to the performance of their obligations.
The reasonable purpose of the government, undoubtedly, is that which it
expressed, namely: 'While we are giving liberally to the railroad company,
we do not give any lands we have already sold, or to which, according to our
laws, we have permitted a pre-emption or homestead right to attach. No
right to such land passes by this grant. No interest in the railroad company
attaches to this land, or is to be founded on this statute.' Such is the clear
and necessary meaning of the words that there is granted every alternate
section of odd numbers to which these rights have not attached. It necessa-
rily means that, if such rights have attached, they are not granted."

· When, on March 26, 1884, the map of the definite location of the ·
Cascade Branch of the Northern Pacific Railroad Company was
filed in the office of the commissioner of the general land office,
the records of the land office showed, then existing and uncanceled,
a declaratory statement filed by Flett for the land in controversy,
for which filing he had paid, and for which he had the certificate
of the local land office. The filing of such a statement was, as
held by the supreme court in Whitney v. Taylor, 158 U. S. 85–94,
15 Sup. Ct. 796, "in the strictest sense of the term, the assertion of
a pre-emption claim; and, when filed and noted, it was officially
recognized as such." The record shows that it so remained, not
·only at the time of the filing of the map of the definite location

of the plaintiff's road, along which the land in controversy is situated, but until December 23, 1891. Is not the condition of the records of the land department, at the time the railroad grant becomes effective, in respect to the land embraced within its limits, to determine the question as to whether the particular land in controversy passed or was excepted from the grant to the company? If not, what becomes of the declarations made by the supreme court in the Dunmeyer Case, above quoted? To permit, for the purpose of a solution of that question, an inquiry into the merits of the pre-emptor's claim, is wholly inadmissible, for the reasons there stated. It is not the validity of the claim, but the fact that it existed at the time of the definite location of the plaintiff's road, that excluded the land in controversy from the category of "public lands," to which alone the company's grant attached. Doolan v. Carr, 125 U. S. 618–638, 8 Sup. Ct. 1228; Whitney v. Taylor, supra.

In the case of Amacker v. Railroad Co., 7 C. C. A. 518, 58 Fed. 850 (referred to by the court below in support of its conclusion), it appeared from the records of the land office themselves that, at the time of the definite location of the road, the pre-emption claim that was relied upon to defeat the company's grant was not existing, for the pre-emption claimant, Scott, had theretofore "voluntarily filed in the land office his amended pre-emption claim, wholly excluding therefrom the land in controversy, and fixing his pre-emption entry upon other land." 7 C. C. A. 518, 58 Fed. 852. It is true that it is recited in the opinion of the secretary of the interior, above quoted, that on February 20, 1874, Flett entered as a homestead another piece of government land, and that on June 9, 1880, he made proof and received a certificate therefor; but it is also true that when, in September, 1870, he went to the local land office for the purpose of making proof of his right to pre-empt the land in controversy, he was denied that right, upon the ground that the railroad company was entitled to the land, and that he had lost it. That the company had not then acquired any right whatever to the land in question has already been shown, and that Flett was then legally and justly entitled to make, if he could, proof of the facts necessary to entitle him to purchase the land under the pre-emption laws, is equally clear. The error of the officers of the local land office in denying him that right is palpable. And such was the view of the subsequent officers of that office, when, in September, 1887, Flett "submitted proof in support of his pre-emption claim, founded upon his declaratory statement filed April 9, 1869," which was allowed by them, and afterwards, on appeal, by the commissioner of the general land office. Its subsequent rejection by the secretary of the interior, upon the ground, in part, that Flett had, in 1874, entered as a homestead another piece of public land, in respect to which he was allowed to make the appropriate proof, and for which he received a certificate, only emphasizes the fact that land in respect to which such a contest was being waged, to make good a claim of record and uncanceled at the time of the filing of the map of the definite location of the plaintiff's road, was not then "public land," to

which the grant to the railroad company attached. It might be difficult to maintain that a pre-emptor who goes to the local land office for the purpose of making proof in support of his claim, and is denied by the officers that right, upon the ground that the land is within a grant to a railroad company, and that he has lost it, can be properly held to have voluntarily abandoned his claim, even though, under such circumstances, he afterwards enters as a homestead another tract; but we think it unnecessary to determine whether Flett intended to abandon his pre-emption claim, or whether he abandoned and forfeited it by entering, in September, 1874, as a homestead, another piece of public land. The controlling fact is that at the time of the definite location of the plaintiff's road, opposite which the land in controversy is situated, there was on the record of the local land office Flett's declaratory statement, which had not been altered, amended, canceled, or set aside; and that fact operated to except the land in respect to which the claim existed from the grant to the railroad company.

The principle applicable to the case is thus summed up by the supreme court in the case of Whitney v. Taylor, supra:

"When on the records of the local land office there is an existing claim on the part of an individual under the homestead or pre-emption law, which has been recognized by the officers of the government, and has not been canceled or set aside, the tract in respect to which that claim is existing is excepted from the operation of a railroad land grant containing the ordinary excepting clauses, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the government at its own suggestion, or upon the application of other parties. It was not the intention of congress to open a controversy between the claimant and the railroad company as to the validity of the former's claim. It was enough that the claim existed, and the question of its validity was a matter to be settled between the government and the claimant, in respect to which the railroad company was not permitted to be heard." 158 U. S. 92, 93, 15 Sup. Ct. 796.

Judgment reversed, and cause remanded for further proceedings not inconsistent with this opinion.