OREGON & C. R. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 19. 1896.)

No. 275.

**1. PUBLIC LANDS—RAILROAD GRANTS—ACT OF FORFEITURE.**
The forfeiture of unearned railroad grants declared by the act of September 29, 1890 (26 Stat. 496), was for the benefit of the United States only, and did not operate in favor of any company claiming such forfeited lands under an overlapping location.

**2. SAME—MAP OF GENERAL ROUTE.**
The map filed March 6, 1865, with the secretary of the interior by the president of the Northern Pacific Railroad Company (known as the "Perham Map"), purporting to designate the general route of the road, but which was rejected by the commissioner of the general land office as being indefinite and not properly authenticated, did not operate as a withdrawal or segregation of any public lands along the route. 69 Fed. 899, reversed.

**3. SAME—OVERLAPPING GRANT.**
The act of July 2, 1864, granting lands to aid in the construction of the Northern Pacific Railroad, did not of itself operate as a withdrawal or appropriation of public lands within the prescribed limits of the route; and by reason of the failure of the company to file a sufficient map of general location opposite lands subsequently traversed by the Oregon & California Railroad prior to the grant made to the latter company (Act July 25, 1866), or prior to the definite location of its route (October 29, 1869), the grant to the Northern Pacific Company never took effect as to such lands, and the title thereof passed to the Oregon & California Company. 69 Fed. 899, reversed. McKenna, Circuit Judge, dissenting.

**4. SAME.**
At the date of the grant of the Oregon & California Company, the right of locating its road so as to take the lands in question existed unimpaired in the Northern Pacific Company, and continued to exist until the act of forfeiture, in consequence of which the lands did not pass to the Oregon & California Company, but were restored by the act of forfeiture to the United States. Per McKenna, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the District of Oregon.

This was a suit by the United States to cancel certain patents issued to the Oregon & California Railroad Company for lands lying within the state of Oregon, which are claimed by said company to have been earned under the act of congress of July 25, 1866, granting it lands to aid in the construction of a line of railroad from Portland to the southern boundary of the state. The circuit court rendered a

decree in favor of the United States (69 Fed. 899), and the defendant appealed.

William F. Herrin and William Singer, Jr., for appellants.

John M. Gearin, for the United States.

Before McKENNA and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. The case is this: By the act of congress of July 2, 1864 (13 Stat. 365), the Northern Pacific Railroad Company was incorporated, with authority to construct and maintain a continuous railroad and telegraph line—

"Beginning at a point on Lake Superior, in the state of Minnesota or Wisconsin, thence westerly by the most eligible railroad route, as shall be determined by said company, within the territory of the United States, on a line north of the 45th degree of latitude, to some point on Puget Sound, with a branch via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon, leaving the main trunk line at the most suitable place, not more than three hundred miles from its western terminus."

And granting to the company, in aid thereof, every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections of land per mile on each side of its line, as the company should adopt through the territories of the United States, and 10 alternate sections per mile where the road passes through any state—

"And whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office; and whenever prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections."

The sixth section of the act provided that:

"The president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act."

On the 6th day of March, 1865, Josiah Perham, as president of the Northern Pacific Railroad Company, addressed to the secretary of the interior the following letter:

"Washington, D. C., 6 March, 1865.

"Hon. J. P. Upsher, Secretary of the Interior—Sir: Under authority from the board of directors of the Northern Pacific Railroad Company, I have designated on the accompanying map, in red ink, the general line of their railroad from a point on Lake Superior, in the state of Wisconsin, to a point on Puget Sound, in Washington territory, via the Columbia river, adopted by said company as the line of said railroad, subject only to such variations as may be found necessary after more specific surveys; and I respectfully ask that the same may be filed in the office of the commissioner of the general land office, together with a copy of the charter and organization of said company, and

that under your directions the lands granted to said company may be marked and withdrawn from sale in conformity to law.

"I am, respectfully, your obt. servt.,

"Josiah Perham, Prest. N. P. R. R. Company."

Accompanying this letter was a map upon which was traced in red ink a line indicated by the letters, "H, J, K, L, M, A, B, C," and extending from Lake Superior to Puget Sound, and along which was written this explanatory statement: "H, J, K, L, M, A, B, C, is practicable railroad, as surveyed by Governor Stevens." On the 9th of March, 1865, the then secretary of the interior, Mr. Upsher, addressed to the commissioner of the general land office the following letter:

"Department of the Interior.

"Washington, D. C., March 9th, 1865.

"Sir: Herewith I transmit a map upon which the 'general line' of the Northern Pacific Railroad, as adopted by the board of directors of that railroad company, is delineated; also a copy of the letter of the president of said company, dated the sixth instant, requesting that the granted lands along said line be withdrawn from market. In view of the provisions of the 3d and 6th sections of the act of congress, approved July 2, 1864 (Pamphlet Laws, pages 368, 369), should you perceive no objection, I think that the odd-numbered sections along the line for ten miles in width on each side, in Minnesota and Wisconsin, and for twenty miles in width on each side along that part of the line extending through the territories westward to Puget Sound, may be withdrawn as requested, as preliminary to the final survey and location of said railroad. The even-numbered sections along the line will, however, be subject to disposal by the United States, as provided in the 6th section of said act of congress.

"Very respectfully, your ob't servant,        J. P. Upsher, Secretary.

"The Commissioner of the General Land Office."

Mr. Harlan having, shortly after, succeeded Mr. Upsher as secretary of the interior, the commissioner of the general land office on June 22, 1865, addressed to him a letter, stating, in substance, that Secretary Upsher had, under date of March 9, 1865, sent to the general land office a diagram showing the proposed route of the Northern Pacific Railroad Company, which diagram had been filed in the secretary's office, accompanied by a request for the withdrawal of the land along such route; that, as no withdrawal had been ordered by Secretary Upsher, no action was taken in the general land office upon the application, and that as Mr. Perham, president of the company, had called attention to the matter, the commissioner, while proceeding to state objections to the diagram, and his reasons for thinking no withdrawal for the benefit of the company should be made, asked for such directions as the secretary should deem proper in the premises. Among the objections urged by the commissioner was this: That the diagram presented to and filed with the secretary did not constitute such a map of the general route of the proposed road as was required by law and the rules of the land department. That these required "a connected map showing the exact location; the map indicating by flagstaffs the progress of the survey; the map to be authenticated by the affidavit of the engineer, with the approval of the accredited chief officer of the grantee." And that, in the judgment of the commissioner, no withdrawal should be ordered until such a map is filed in the general land office.

These views of the commissioner, so far as the record shows, were acquiesced in by the secretary of the interior, as well as by the Northern Pacific Railroad Company; for nothing further, so far as appears, was ever done with or under the Perham map or diagram.

On the 25th of July, 1866, congress made a grant to the Oregon & California Railroad Company, in aid of the construction of a line of railroad and telegraph beginning at the city of Portland, Or., and extending thence southerly through the Willamette, Umpqua, and Rogue River valleys, to the southern boundary of that state, there to connect with a line of railroad and telegraph to be built from a point on the Central Pacific Railroad, in the Sacramento valley, in California, to the point of connection at the Oregon line. 14 Stat. 239. The grant was of every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections of land per mile (10 on each side) of the designated line, with the provision usually found in such grants, for the selection of indemnity lands within defined limits for such sections, or parts of sections, within the primary limits, as shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of. On October 29, 1869, the Oregon & California Railroad Company duly filed in the office of the commissioner of the general land office its map of definite location, showing that portion of the surveyed line it was by the act of July 25, 1866, authorized to build from Portland southerly to the California boundary, and extending beyond and opposite the lands here in controversy. The map so filed was accepted, and by direction of the secretary of the interior the commissioner of the general land office on the 31st day of January, 1870, ordered the withdrawal, for the benefit of the Oregon & California Railroad Company, from sale or location, pre-emption, or homestead entry, all the odd-numbered sections within 20 and 30 miles of the designated line of road. The Oregon & California Railroad Company proceeded to construct the road along the line so designated, and, having completed it, it was inspected by commissioners appointed for the purpose by the president; and, having been found by him to have been constructed in accordance with the terms of the grant, patents were afterwards, and prior to the commencement of this suit, issued to the Oregon & California Railroad Company for the lands in controversy. Nothing was done by the Northern Pacific Railroad Company under its grant, except the filing of the Perham map or diagram, together with the accompanying letter of the president of that company, and his request for the withdrawal of the lands along its line for its benefit, prior to the definite location of the route of the Oregon & California Railroad Company on October 29, 1869. In the year following, to wit, May 31, 1870, congress passed a joint resolution, by which, among other things, the Northern Pacific Railroad Company was authorized—

"To locate and construct, under the provisions and with the privileges, grants, and duties provided for in its act of incorporation, its main road to some point on Puget Sound via the valley of the Columbia river, with the right to locate

and construct its branch from some convenient point on its main trunk line across the Cascade Mountains to Puget Sound; and in the event of there not being in any state or territory in which said main line or branch may be located, at the time of the final location thereof, the amount of lands per mile granted by congress to said company, within the limits prescribed by its charter, then said company shall be entitled, under the directions of the secretary of the interior, to receive so many sections of land belonging to the United States, and designated by odd numbers, in such state or territory, within ten miles on each side of said road, beyond the limits prescribed in said charter, as will make up such deficiency, on said main line or branch, except mineral and other lands as excepted in the charter of said company of eighteen hundred and sixty-four, to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July two, eighteen hundred and sixty-four. And that twenty-five miles of said main line between its western terminus and the city of Portland, in the state of Oregon, shall be completed by the first day of January, Anno Domini eighteen hundred and seventy-two, and forty miles of the remaining portion thereof each year thereafter until the whole shall be completed between said points." 16 Stat. 378.

By this resolution, as said by Mr. Secretary Lamar in Railroad Co. v. McRae, 6 Land Dec. Dep. Int. 400—

"The designations of the lines of the road were changed. That which by the granting act was known as the 'branch line' (via the valley of the Columbia river, to a point at or near Portland, in the state of Oregon) was changed to 'main road' or 'main line,' and that which had been designated as 'main line' (across the Cascade Mountains to Puget Sound) was changed to 'branch line.' So, by the joint resolution of 1870 (May 31st), the company was authorized to locate and construct its main line via the Columbia river, through some point at or near Portland, Or., to a suitable point on Puget Sound, with the privileges, grants, and duties provided for in its act of incorporation."

After the passage of the joint resolution of May 31, 1870, to wit, on August 4, 1870, two maps, designating the general route of its road, were filed by the Northern Pacific Railroad Company in the general land office, upon which orders of withdrawal of the lands along the line indicated thereby were made, respectively, August 13, 1870, and October 27, 1870, within the limits of which withdrawals are the lands afterwards patented to the Oregon & California Railroad Company, and here involved. The Northern Pacific Railroad Company never filed any map of definite location of the line it was authorized to build opposite the lands in controversy, and never built such line; and, for its failure in this respect, congress, by the act of September 29, 1890 (26 Stat. 496), forfeited whatever rights, if any, the company had to the lands here in question, and by the present suit the government seeks to cancel the patents therefor, which were issued to the Oregon & California Railroad Company.

That the Oregon & California Railroad Company got nothing by the forfeiture of September 29, 1890, is clear, for the forfeiture declared was for the benefit of the government only. U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152. And if the grant to the Northern Pacific Railroad Company ever attached to the lands in controversy, or if they were withdrawn from the mass of public lands for the benefit of that company at the time the grant to the Oregon & California Railroad Company became effective, it is clear that they were not embraced by that grant, and

that the patents therefor should be annulled. The real question in the case, therefore, is, did the lands in question ever become affected by any grant to the Northern Pacific Railroad Company? If they were public lands, not mineral, and not granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, at the time of the grant to the Oregon & California Railroad Company, and at the time of the filing of the map of definite location of the route of that company's road along and opposite to them, it is obvious that they would be embraced by the grant to that company, and cannot be affected by any grant contained in the subsequent joint resolution of congress of May 31, 1870. That resolution, as held by the supreme court in the case entitled U. S. v. Northern Pac. R. Co., 152 U. S. 284, 294, 297, 14 Sup. Ct. 598, 602, 603, contained a new grant to the Northern Pacific Railroad Company, but did not embrace .any public land disposed of after the passage of the act of July 2, 1864. The joint resolution of May 31, 1870, and the proceedings taken thereunder by the Northern Pacific Railroad Company, have therefore no bearing whatever on the question in this case, and the effect given by the court below to the maps filed by the Northern Pacific Railroad Company under and pursuant to the provisions of that resolution constitutes one of the errors into which the court below fell in its consideration and decision of the case.

The only thing remaining in the case that could take the lands in controversy out of the mass of public lands to which the grant of 1866 to the Oregon & California Railroad Company applied, is the preceding grant to the Northern Pacific Railroad Company of July 2, 1864, and the Perham map or diagram filed thereunder. It is not pretended that any order of withdrawal was made by any officer of the land department based on that map. Was it sufficient, taken in connection with the act of July 2, 1864, to constitute a statutory withdrawal of the lands in question for the benefit of the Northern Pacific Railroad Company? It was not, for at least two very substantial and obvious reasons. Upon its face, as well as by the letter accompanying it, from the president of the Northern Pacific Railroad Company, of date March 6, 1865, it purported to be a designation of the general route of a railroad from a point on Lake Superior, in the state of Wisconsin, via the valley of the Columbia river, to Puget Sound, in the state of Washington, which the letter of its president stated the company had adopted as the line of its road. That was not the line the Northern Pacific Railroad Company was authorized by the act of July 2, 1864, to locate and build. The line authorized by that act, and in aid of which that grant was made, extended, as has been seen, from a point on Lake Superior, in the state of Minnesota or Wisconsin, westerly, by. the most eligible railroad route, on a line north of the forty-fifth degree of latitude, and within the territory of the United States, to some point on Puget Sound, with a branch via the valley of the Columbia river to a point at or near Portland, in the state of Oregon; leaving the main trunk line, at the most suitable place, not more than 300 miles from its western terminus.

13 Stat. 365; U. S. v. Northern Pac. R. Co., 152 U. S. 284, 14 Sup. Ct. 601. As said by the supreme court in the case just cited,

"Although that act allowed the company to adopt the most eligible route, within the territory of the United States, north of the forty-fifth degree of latitude, it is clear that congress contemplated the construction of a main trunk line between Lake Superior and Puget Sound, which would not touch any point 'at or near Portland,' and the western end of which would be east and northeast of a direct line between Portland and Puget Sound, and, in addition, a branch line leaving the main trunk line, at some suitable place, not more than three hundred miles from its western terminus, and extending 'via the valley of the Columbia river to a point at or near Portland.' If the main line, as originally indicated by the act of 1864, had been established on the route between Portland and Puget Sound, the branch line could not have left the main line at some point not more than three hundred miles from its western terminus, and extended via the valley of the Columbia river to a point at or near Portland. The authority given to the company to adopt the most eligible route did not authorize it, by a map of general route, to cover an unlimited extent of country, north of the forty-fifth degree of latitude. On the contrary, as said in St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 13, 11 Sup. Ct. 389, 393, 'when the termini of a railroad are mentioned for whose construction a grant is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant.' "

The indefiniteness of the Perham map or diagram, which is so manifest on its face, was alluded to by the supreme court, in the same case (152 U. S. 292, 14 Sup. Ct. 601), in these words:

"It may be that the indefiniteness of the map of general route presented by the Northern Pacific Railroad Company in 1865 constituted the reason why that map was not accepted by the interior department."

So it was, as has already been shown. The fact that upon its face it did not purport to be anything more than a mere sketch or diagram, unauthenticated by any engineer or officer charged with the duty of designating such a route, coupled with the fact that it was not only not accepted, but was rejected, by the land department of the government, as insufficient to properly designate the general route of the road the company was by the act of congress authorized to build, constitutes a second reason why the granting act did not itself operate to withdraw the lands in controversy for the benefit of the Northern Pacific Railroad Company. They therefore remained public lands, to which the subsequent grant to the Oregon & California Railroad Company might apply, unless it be that the grant contained in the act of July 2, 1864, in and of itself, without any designation of the route of its road by the grantee, the Northern Pacific Railroad Company, operated to withdraw the lands in controversy from the mass of public lands. And, if these lands, why not all other public lands within the territory of the United States, situated north of the forty-fifth degree of latitude, and between the termini named in the act? It would be difficult to maintain any distinction in this respect between any of the public lands, not mineral, situated in the immense belt through and along which the Northern Pacific Railroad Company might have located and constructed its road.

The court below, in its opinion, held that:

"It might definitely locate its line in good faith, in compliance with the requirement of the act, and by such location select and acquire the lands within the place limits upon both sides of its line. It is unimportant that the company never exercised this power."

In holding that it is unimportant that the Northern Pacific Railroad Company never exercised its right to locate and build its road along and opposite to the lands in controversy, the court below committed its second error. It is said that the grant contained in the act, in and of itself, was "an appropriation of the public lands." Of what public lands? Of all the public lands situated within that immense belt through and along which the Northern Pacific Railroad Company was authorized to locate and build its road? Manifestly, if, prior to any designation by the grantee company of the line of road it was authorized to locate and build, the act making the grant, in and of itself, operated as an appropriation of any particular land, it operated as an appropriation of all public lands within the United States situated north of the 45th degree of latitude, and between the termini named in the act; for, prior to some designation of the route, it could not be known where the grantee company would find the most eligible railroad route, along which route it was authorized to build. We repeat, therefore, that prior to the designation of some route no distinction can be made between any of the public lands, not mineral, situated in the belt through and along which the Northern Pacific Railroad Company might have located and constructed its road. Is it possible that all of that immense body of public land was, by the act of July 2, 1864, in and of itself, without any designation by the grantee company of the line of its road, withdrawn from subsequent grants? Undoubtedly not. In the case of U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152, the supreme court said that the intent of congress in all railroad land grants, as has been declared by that court again and again, was that such grants shall operate at a fixed time, and shall take only such lands as at that time are public lands. And in respect to this very grant of July 2, 1864, the supreme court, in the case of U. S. v. Northern Pac. R. Co., 152 U. S. 296, 14 Sup. Ct. 598, 603, in express terms declared that it embraced only public land to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time its line of road was definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office. As it is not pretended that any such line, in so far as concerns the lands here in controversy, ever was definitely fixed, how that grant, in and of itself, without any designation of the required route, can be held to embrace these lands, we are unable to understand. It requires an act of the grantee to give precision to such grants, and to identify by the location of its road the lands embraced by the grant. When that is properly done, the grant attaches thereto, and becomes effective as of its date; but, until there is some designation of route by the grantee, there is nothing to segregate any particular land from the mass of public lands, and manifestly, if such segregation

never occurs, those that otherwise might be covered by the grant remain public lands, and subject to any other valid grant that congress may have made embracing them. The grant of July 2, 1864, to the Northern Pacific Railroad Company never having taken effect, so far as concerns the lands in controversy in this suit, they were public lands at the time of the grant to the Oregon & California Railroad Company, and at the time of the definite location by that company of the road it was authorized to build along and opposite to them; and falling as they do within the terms of that grant, and having been earned by and patented to that company, the judgment is reversed and the cause remanded, with directions to the court below to dismiss the bill.

McKENNA, Circuit Judge (dissenting). It is contended by appellants that the grant to the Oregon & California Railroad Company is within the reservations of the grant to the Northern Pacific Railroad Company; that is, by filing its map of definite location before the Northern Pacific Company had fixed its line of road, either by a map of general route or definite location, it acquired priority of right, by the exceptions in the grant to the Northern Pacific Company. This is important to be considered. If true, it determines the case in favor of appellants, without regard to the propositions considered by the majority of the court. If not true, it is yet important as bearing on these propositions. Section 3 of the Northern Pacific Railroad act is as follows:

"And be it further enacted: that there be and hereby is granted to the Northern Pacific Railroad Company * * * for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast * * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of said railroad line, as said company may adopt through the territories of the United States, and ten alternate sections per mile on each side of said railroad whenever it passes through any state; and *whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office;* and whenever prior to said time, any of said sections, or parts of sections, shall have been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof. * * *"

The reservation is in italics, and its letter supports the contention of appellants, and it is claimed that it is also supported by U. S. v. Northern Pac. R. Co., 152 U. S. 284, 14 Sup. Ct. 598. In opposition to the contention, appellees rely on Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491, and St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389.

Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491, was a suit which involved the title to lands claimed by two railroad companies under grants from the United States. The decision is by Justice Field, and is expressed with the usual clear and firm precision which characterizes his opinions. The grants passed on had reservations similar to those in the present case, and after considering their nature, and the objects of the reservations, he said:

"It was not within its language or purpose to except from its operation any portion of the designated lands for the purpose of aiding in the construction of other roads."

St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 394, was also a contest between two grants, and one of them the grant to the Northern Pacific Railroad Company. Mr. Justice Field said:

"It is also urged against the priority of the plaintiff's claim that, by the terms of the act making the grant to the Northern Pacific Railroad Company, all subsequent grants prior to the definite location of its road are excepted."

And then, showing that the contention had no application to the case, he further said:

"But independently of this conclusion, we are of opinion that the exception in the case making the grant to the Northern Pacific Railroad Company was not intended to cover other grants for the construction of roads of a similar character, for this would be to embody a provision which would often be repugnant to and defeat the grant itself. Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491, 498, 499."

Appellants, however, urge that these expressions are but dicta. If so, they nevertheless were confidently laid down, and in such way as to seem to be the conviction of the whole court. In St. Paul & P. R. Co. v. Northern Pac. R. Co. they were one of two answers to an explicit contention which was made; and in Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co. it was the purpose of the court to give such fullness of consideration and decision, not only as to what was granted, but the limitations on what was granted, and make the case determinative of controversies arising on both. In U. S. v. Northern Pac. R. Co. the controversy was of the ownership of certain lands which the United States claimed by reason of a forfeiture of a grant to the Oregon Central Railroad Company. The Northern Pacific Company claimed them under the grant contained in the resolution of 1870, which is set out in the opinion of the majority of this court. On the question of the lands being within the resolution of 1870, Mr. Justice Harlan, speaking for the court, said:

"But does the grant contained in the resolution of 1870 embrace the particular land in dispute? The act of 1864 granted to the Northern Pacific Railroad Company only public land, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time its line of road was definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office. And by the resolution of 1870 it was declared that if, at the time of the final location of the company's main line or branch, there were not enough lands per mile within the prescribed limits, the deficiency could be supplied from lands, within ten miles beyond those limits, other than mineral and other lands, as excepted in the charter of the company, 'to the amount of the lands that have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of subsequent to the passage of the act of July 2, 1864.' It is, therefore, clear that no public land disposed of after the passage of the act of July 2, 1864, was intended to be embraced in the grant of May 31, 1870. The lands here in question were disposed of by the United States after the passage of the act of 1864, and before the passage of the joint resolution of May 31, 1870; for they are within twenty miles of the land of the Oregon Central Railroad Company, as shown on its map of definite location, filed January 31, 1872, and based upon the grant to it of May 4, 1870. It is true that the Northern Pacific Railroad Company on the 13th day of August, 1870, acting

under the joint resolution of May 31, 1870, filed a map of the general route of its main line from a point on Puget Sound; that, on the same day, twenty sections per mile on each side of the line indicated on it were withdrawn from sale for the benefit of the company; and that this was followed by a map, filed September 13, 1873, of the definite location of its line from Kalama to Tenino. But it is well settled that in respect to the public lands within, at least, common granted or primary limits, priority of grant, not priority of location, determines the question of ownership, as between parties claiming the same lands under different grants. Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co., 97 U. S. 491; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 369, 12 Sup. Ct. 13, 17; U. S. v. Southern Pac. R. Co., 146 U. S. 570, 598, 606, 13 Sup. Ct. 152, 157, 160."

It is clear, therefore, that this case does not militate against St. Paul & P. R. Co. v. Northern Pac. R. Co., or Missouri, K. & T. Ry. Co. v. Kansas Pac. Ry. Co. The point was not presented in the same way, nor did it depend upon the same reason or reasoning. In the latter cases the reservations were of future dispositions under the ordinary land laws. In U. S. v. Northern Pac. R. Co. (treating the resolution of 1870 as a grant as of that time) the reservations were of prior dispositions. The difference is substantial, and demanded the different interpretations given. From a grant to a railroad company of undefined limits, it might be well to except lands to be disposed of under the ordinary land laws, and not grants to other railway companies. The former might be consistent with the grant, —at any rate, could not impair it to an appreciable extent, or beyond what could be compensated by the lieu land provision, while it would not interrupt the settlement of the country. The latter would be repugnant to the grant, and might defeat it utterly.

It follows, therefore, that the grant to the appellant road was not within the reservation of the grant to the Northern Pacific Company, and we are brought to the proposition discussed by my learned associates, and upon which I differ from them, to wit, did the grant to the Northern Pacific Company by the act of 1864 amount to such an appropriation of the lands in controversy as to preclude them from the operation of the grant to the Oregon & California road by the act of 1866? I state the question without regard to the Perham or other maps filed under the resolution of 1870; for I agree with the majority of the court that neither the Perham map, nor that resolution, nor the maps filed under it, have any bearing on the question to be determined, and that, if the circuit court gave effect below to such maps, it was error. But I am not sure that the circuit court did give effect to them. There is some uncertainty in the statement of the learned judge who presided in that court, but I am not sure that there was any in his view of the ultimate and decisive question of the case.

Many phases of railroad land grant cases have been presented to the supreme court, and have been so firmly established as to become postulates. These are: That grants of that kind are grants in præsenti, in the nature of a float. That they do not attach to specific sections until identification by a map of definite location of the road. That, within what has been called "common granted or primary limits," the date of the grant is the determinative fact in contending railway grants, not the date of

location,—giving, if prior, priority of right; if at the same time, equality of right (that is, giving the land in equal, undivided moieties); in neither case can an advantage be secured by priority of location or of construction. That the condition of building the road is a condition subsequent, the right and grant continuing until forfeiture by or entry by the United States. And that the forfeiture or entry, in the absence of explicit legislative declaration, is for the benefit of the United States, not for the benefit of subsequent grantees. Applying these principles, and the principle that we have seen is likewise established, to wit, that subsequent grants to railroads are not within the reservations of prior ones, how should the question in this case be answered? The last principle expressed removes, as irrelevant to contests between railway grants, maps of general route or of definite location. They only have purpose to the objects of the reservations, to wit, settlers (homestead or pre-emption), not railroads. As to these (that is, as to railroads), we can only have regard to the date of the grant and the rights conveyed. I cannot see (and I say it with deference) that the consequence, though it inevitably follows, that, if the lands in controversy be deemed appropriated by the Northern Pacific act, all lands situated north of the forty-fifth degree of latitude must have been withdrawn, is very embarrassing. To what is it embarrassing? To settlers,— to the occupation and development of the country under the land laws? Not at all. This is prevented by the reservations in the grant. To other railroad companies? Grants to these was not a constant, but an occasional, policy, and dependent so much upon special circumstances as to require (certainly not necessarily to exclude) a right of selection of route in a wide territory. If this was to be primarily guarded against, or to be afterwards corrected, the remedy was in congress and obvious. But it does not inevitably follow that all the land north of the forty-fifth degree of latitude was withdrawn. The grant had a limitation, and a practical one, too. The right was not to run the road anywhere north of the forty-fifth degree of latitude, but from a point on Lake Superior to a point on Puget Sound, by the most direct, eligible route. The supreme court said in U. S. v. Northern Pac. R. Co., supra:

"Although that act allowed the company to adopt the most eligible route, within the territory of the United States, north of the forty-fifth degree of latitude, it is clear that congress contemplated the construction of a main trunk line between Lake Superior and Puget Sound, which would not touch any point, 'at or near Portland,' and the western end of which would be east and northeast of a direct line between Portland and Puget Sound, and, in addition, a branch line leaving the main trunk line at some suitable place, not more than three hundred miles from its western terminus, and extending 'via the valley of the Columbia river to a point at or near Portland.' If the main line, as originally indicated by the act of 1864, had been established on the route between Portland and Puget Sound, the branch line could not have left the main line at some point not more than three hundred miles from its western terminus, and extended via the valley of the Columbia river to a point at or near Portland. The authority given to the company to adopt the most eligible route did not authorize it, by a map of general route, to cover an unlimited extent of country north of the forty-fifth degree of latitude. On the contrary, as said in St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 13, 11 Sup. Ct. 389, 393: 'When the termini of a railroad are mentioned, for whose construction a grant

is made, the extent of which is dependent upon the distance between those points, the road should be constructed upon the most direct and practicable line. No unnecessary deviation from such line would be deemed within the contemplation of the grantor, and would be rejected as not in accordance with the grant.'"

I have said, as to contesting railroad grants, we do not regard maps, either of general route or of definite location, but only the date of the grants, and the rights conveyed by them. What rights are conveyed by them? There are two,—one ultimate and the other provisional. The ultimate one gives a title to a certain number (20 in the territories, 10 in the states) of specific sections. The provisional gives a power of selection of these from a wider extent of territory. Is it not a substantial and necessary right? May it exist, in fullness, and with power to exercise, in two railroad companies at the same time? Manifestly not. May it exist in them in succession, or, rather, suspended in one until default in the other? If so, when comes default, and how? In the answer to the first of these questions, it must, of course, be conceded that congress has the power to grant a right in the public lands expectant or conditional upon the nonaccruing of another, and probably the reasons for its existence, or the embarrassments of a contrary view, have not been, and cannot be, put more strongly than the ability of counsel have put them in this case. But the same reasoning was urged in one of the first railroad land grant cases. Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733. It was urged in the last. U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152. It formed the basis of the able dissenting opinions in both cases, but the majority of the court has firmly resisted it,—given always the same answer to it: That congress, in any of its grants, cannot be supposed to have thereby intended to include land previously assigned for another purpose, that it did not intend to cause or invite vexatious conflicts, and that it only concerned the United States what became of land claims to which were abandoned or forfeited. In U. S. v. Southern Pac. R. Co., supra, the lands in controversy lay within the granted limits of the Atlantic & Pacific and Southern Pacific Companies, at the crossing of their lines as definitely located. Congress passed an act forfeiting the grant to the Atlantic & Pacific Company, and it was claimed by the Southern Pacific Company under its grant. The Southern Pacific Company filed its map April 3, 1871,—more than a year before the Atlantic & Pacific Company filed its map; and it was hence contended that, if the title of the Southern Pacific Company was displaced, it was only conditionally displaced,—that is, displaced on condition that the Atlantic & Pacific Company should, by the final completion of its road, perfect its right thereto. The court, however, resisted the contention, and held that whatever title or right the Southern Pacific Company might acquire by a prior filing of its map was absolutely displaced when the Atlantic & Pacific Company's map was filed. "Illy as it may accord," said Mr. Justice Brewer, "with the common-law notions of identification of tracts as essential to a valid transfer of title, it is fully settled that we are to construe these acts of congress as laws, as well as grants; that con-

gress intends no scramble between companies for the grasping of titles by priority of location, but that it is to be regarded as though title passes as of the date of the act, and to the company having priority of grant, and therefore that, in the eye of the law, it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific." Some misunderstanding may arise from the use of the word "attached" in this citation. It is manifest, however, the expression was only used to meet the language of the contention. It is manifest that there was no displacement of title. There never was any in the Southern Pacific Company to be displaced. There was an act of congress forfeiting the title of the Atlantic & Pacific Company, and the court held that this did not inure to the benefit of the Southern Pacific Company. The case was a controversy over the title to specific tracts. Does its principle apply to a controversy over the right of selection of specific tracts? It is said that there is a passage in the opinion which forbids such application. It is as follows:

"Indeed, the intent of congress in all railroad land grants, as has been understood and declared by this court again and again, is that such grant shall operate at a fixed time, and shall take only such lands as at that time are public lands, and therefore grantable by congress, and is never to be taken as a floating authority to appropriate all tracts within the specified limits which at any subsequent time may become public lands. The question is asked: Supposing the Atlantic & Pacific Company had never located its line west of the Colorado river; would not these lands have passed to the Southern Pacific Company, under its grant? Very likely that may be so. The language of the Southern Pacific Company's grant is broad enough to include all the land along its line, and, if the grant to the Atlantic & Pacific Company had never taken effect, it may be that there is nothing that would interfere with the passage of the title to the Southern Pacific Company."

On a disputable proposition, it is natural to look to any intimation of the supreme court, not only because of the supremacy of that tribunal, but because of the learning and abundant care which are bestowed upon its opinions. Yielding to this to the utmost, I cannot find anything authoritative in the passage. Such questions are often put, and as often answered as the court answered that one,— or, rather, did not answer it, but only noticed,—conceding a possibility which it was not necessary to decisively affirm or deny. But the court proceeded to say that the result supposed by the question was neither intended nor expected by congress, and, if there had been no act of forfeiture, the Atlantic & Pacific could yet have constructed its road and secured the lands. "No power," said the court, "but that of congress, could interfere with this right of the Atlantic & Pacific. No one but the grantor can raise the question of a breach of a condition subsequent." This language and reasoning are applicable to every right under the granting acts, whether we consider the intention of congress, or its power to forfeit, and the effect of its exercise of the power, and it seems to me irresistibly so. By the express declaration of the act, the grants were made, and the rights and privileges were conferred upon and accepted by the Northern Pacific Railroad Company, on the condition that it should commence work on the road within two years from the approval of the act by

the president, and complete and equip the whole road by the 4th of July, 1876; and the further condition that if the company should make any breach of the conditions of the grants, and allow the same to continue for upwards of one year, then at any time thereafter the United States might do any and all acts and things needful and necessary to insure a speedy completion of the road. Sections 8 and 9. Subsequently a joint resolution was passed by congress, extending the time for the commencement of the road to July 2, 1868, and for its completion to July 4, 1878. 14 Stat. 355, § 2. On the 31st day of May, 1870, congress passed the joint resolution already referred to, giving the company power to make "branch line," "main line," and the latter "branch line," but neither taking away nor giving other rights. The grant to the Oregon & California Railroad Company was made on the 25th of July, 1866. But the default in commencing the road within two years, or the default in building it, either under the original act or the resolution of 1870, was no concern of the Oregon & California Railroad Company. Nor did the forfeiture of September 29, 1890, inure to its benefit. In other words, it got no rights by either the default of the Northern Pacific, or the forfeiture by the United States. By what, then, did it get rights, and when? Only by its grant, if at all. But at the date of that the right of locating its road so as to take the lands in controversy existed unimpaired in the Northern Pacific Company, under the prior grant of 1864, and continued to exist, and did exist, unimpaired in that company January 29, 1870, when the Oregon & California Company filed its map of definite location; did exist when that company built its road; did exist in 1871 and 1877, when patents were issued to that company. If not, by what was it taken away? Certainly not by any act of the United States, and the United States alone had the power. No act of the Oregon & California Company could do it. The default of the Northern Pacific Company, if there was any, was no concern of the Oregon & California Company. This company had no rights. except, as I have already said, those its grant gave it. It could get none from filing a map of definite location, or none by building its road, or impair none that the Northern Pacific Company received by its grant. This seems very plain, but may not the reasoning be still further extended? Whatever rights passed to the Northern Pacific Company by the act of 1864 could only be lost by abandonment, or by resumption by the United States on account of nonperformance of conditions. Abandonment is not claimed, and, if it were, abandonment of rights, as forfeiture of rights, has always been held not to contribute to railroad grants. Were the rights of the Northern Pacific Company taken away by forfeiture? The majority of the court say no. My Brother ROSS' language is:

"That the Oregon & California Railroad Company got nothing by the forfeiture of September 29, 1890, is clear; for the forfeiture was for the benefit of the government only. U. S. v. Southern Pac. R. Co., 146 U. S. 570, 13 Sup. Ct. 152."

But, if not by that forfeiture, not at all; and the rights (and all of them) of the Northern Pacific Company still exist, and may yet be

exercised. Is not this an irresistible conclusion from the cases? Do not all rights of the Northern Pacific Company, in complete fullness, exist until they shall be exercised or forfeited? Does not the right to build its road exist, and all rights necessary for that greater right also 'exist? Are they not inseparable? Is not one the complement of the other? And, if so, does not the language of Justice Brewer in U. S. v. Southern Pac. R. Co., supra, accurately apply? I think so. He said:

"Again, there can be no question, under the authorities heretofore cited, that, if the act of forfeiture had not been passed by congress, the Atlantic & Pacific could yet construct its road, and that, constructing it, its title to these lands would become perfect. No power but that of congress could interfere with this right of the Atlantic & Pacific. No one but· the grantor can raise the question of a breach of a condition subsequent. Congress, by the act of forfeiture of July 6, 1886, determined what should become of the lands forfeited. It enacted that they be restored to the public domain. The forfeiture was not for the benefit of the Southern Pacific. It was not to enlarge its grant as it stood prior to the act of forfeiture. It had given to the Southern Pacific all that it had agreed to in its original grant, and now, finding that the Atlantic & Pacific was guilty of a breach of a condition subsequent, it elected to enforce a forfeiture for that breach, and a forfeiture for its own benefit."

It follows from these views that the decision of the circuit court was correct. There are other points urged by appellants, either for modification or reversal of the judgment, which, not being decisive of the merits of the case, I have not considered, in view of the effect of the opinion of the majority of the court.